○                                    ○                    FILED

IN THE UNITED STATES DISTRICT COURT            JAN 2 5 2007
FOR THE DISTRICT OF COLUMBIA            NANCY MAYER WHITTINGTON, CLERK
                                                U.S. DISTRICT COURT

RAYMOND A. LONG, M.D.                CASE NUMBER   1:07MS00035

   Plaintiff                        JUDGE: Royce C. Lamberth

                                     DECK TYPE: Miscellanous

v.                                   DATE STAMP: 01/25/2007
                                     )
                                     )
TRIAD HOSPITALS, INC.;               )
QUORUM HEALTH RESOURCES, LLC;        )
NORTHWESTERN MEDICAL CENTER, INC.;   )
PETER A. HOFSTETTER;                 )
JACQUES M. ARCHAMBAULT, M.D.;        )
MICHAEL BURFOOT, B.M., B.Ch.;        )
JOSEPH SALOMONE, M.D.;               )
and                                  )
STEPHEN MASON, M.D.                  )
                                     )
                                     )
   Defendants                       )


DEFENDANT PETER HOFSTETTER'S
MOTION TO QUASH SUBPOENA DUCES TECUM


COMES NOW Defendant Peter Hofstetter and files this Motion to Quash Subpoena Duces

Tecum pursuant to Rule 45(d) of the Federal Rules of Civil Procedure. In support of the Motion,

Mr. Hofstetter states as follows:

1.      This action was initiated by Plaintiff Raymond A. Long in the United States District

Court for the District of Vermont as Civil Action No. 2:05-CV-21. In the Amended Complaint,

Plaintiff makes the specious claim that Mr. Hofstetter violated the Sherman and Clayton Acts by

"engaging in [an] unlawful combination and conspiracy to Destroy Dr. Long's career . . . and by

forcing him to resign from [Northwestern Medical Center] under duress." *See* Amended Complaint,

attached hereto as Exhibit "A," at ¶ 507. Additionally, Plaintiff asserts that Mr. Hofstetter, as the

1

chief executive officer of Northwestern Medical Center, tortiously interfered with Plaintiff's professional relationships and business expectations. *Id.* at ¶¶ 528, 530, 546. Finally, Plaintiff claims that he was defamed by Mr. Hofstetter and cast in a "false light" as a result of certain communications between Mr. Hofstetter and the hospital's medical executive committee. *Id.* at 575, 592. Mr. Hofstetter denies all of the claims asserted by Plaintiff and further denies that Plaintiff is entitled to any relief whatsoever from the claims asserted in the Amended Complaint.

2.      On January 5, 2007, Plaintiff served a subpoena duces tecum, issued by this Court, on the Office of Registrar for American University ("American University"), commanding American University to produce by January 19, 2007, various documents pertaining to Mr. Hofstetter's tenure as a student at American University.[1] A copy of the subpoena is attached hereto as Exhibit "B." The subpoena commands production of documents from a non-party that are wholly irrelevant to any claim or defense asserted in this litigation.

3.      Specifically, American University is commanded to produce the following documents, which are patently irrelevant:

> a)      Copies of any transcripts, evaluations, grades and/or complaints regarding the academic performance of Peter A. Hofstetter.
>
> b)      Any documents which refer or relate to any disciplinary actions threatened or taken against Peter A. Hofstetter including any investigation, reprimand, probation, suspensions, monitoring, proctoring or termination.
>
> c)      A list of curricula and courses taken by Peter A. Hofstetter.
>
> d)      Any documents which refer or relate to requests for information about Peter A. Hofstetter from third parties including but not limited to prospective employers, governmental authorities and professional associations.

*Id.*

---

[1] Mr. Hofstetter obtained a B.A. degree from American University in 1974 and a M.P.A. degree in 1997.

4.    Counsel for Mr. Hofstetter have offered orally and in writing to permit American University to confirm that it did indeed award a B.A. to Mr. Hofstetter in 1974 and an M.P.A. in 1977. Counsel for Plaintiff rejected the oral offer and has not responded to the subsequent written offer.

5.    Without question, "[a] federal court has the authority to quash a subpoena that seeks material which is clearly irrelevant." *Cofield v. City of LaGrange,* 913 F.Supp. 608, 614 (D.D.C. 1996). Citing Rule 26(b) of the Federal Rules of Civil Procedure, the Court in *Cofield* explained that subpoenaed documents "must be relevant to the subject matter of the litigation and reasonably calculated to lead to admissible evidence." *Id.* The documents subpoenaed by Plaintiff are neither relevant to any claims or defenses in the case nor are they likely to lead to the discovery of admissible evidence.

6.    Certainly, Mr. Hofstetter's academic records from the 1970s have no bearing on the claims asserted in this cause. Instead, the subpoena is simply a fishing expedition intended to harass Mr. Hofstetter. Moreover, the subpoena serves as an annoyance and undue burden on a non-party. Accordingly, the subpoena should be quashed.[2]

7.    For the foregoing reasons, Mr. Hofstetter respectfully requests that the Court quash Plaintiff's subpoena commanding American University to produce the above described documents.

WHEREFORE, Defendant Peter Hofstetter respectfully requests that the Court enter an Order quashing Plaintiff's subpoena duces tecum.

THIS, the 23rd day of January, 2007.

Respectfully Submitted,

---

[2] Although a party generally cannot move to quash a subpoena served on a third party, a party can challenge a subpoena where the challenging party claims "privilege, proprietary interest, or *personal interest* in the subpoenaed matter." *Washington v. Thurgood Marshall Academy,* 230 F.R.D. 18, 21 (D.D.C. 2005) (emphasis added). Mr. Hofstetter has a personal interest in the documents that Plaintiff seeks to subpoena and therefore has standing to challenge the subpoena.

JM 436044 v1

Peter A. Hofstetter

By his Attorneys

Phillip C. Zane
(Bar No. 452939)

Robert E. Hauberg, Jr.
Phillip C. Zane
BAKER, DONELSON, BEARMAN, CALDWELL
 & BERKOWITZ, P.C.
Lincoln Square
555 Eleventh St., NW, 6th Floor
Washington, D.C.  20004
Telephone:  (202) 508-3400
E-mail:  rhauberg@bakerdonelson.com
E-mail:  pzane@bakerdonelson.com

4

## CERTIFICATE OF SERVICE

I hereby certify that, on this 23rd day of January, 2007, I sent the foregoing pleading by overnight courier and electronic mail to the parties listed below:

**Lloyd George Parry, Esq.**
*lgparry@dpt-law.com*
Davis, Parry & Tyler, P.C.
1525 Locust Street, 14th Floor
Philadelphia, PA 19102-3732
*Attorneys for Plaintiff*

**R. Jeffrey Behm, Esq.**
*jbehm@sheeheyvt.com*
**Ian P. Carleton, Esq.**
*icarleton@sheeheyvt.com*
Sheehey, Furlong & Behm, P.C.
Gateway Square, 30 Main Street
Burlington, VT 05402
*Attorneys for Defendants*
*Jacques M. Archambualt, M.D. and*
*Michael Burfoot, B.M., B. Ch.*

**Mark L. Mattioli, Esq.**
*mmattioli@postschell.com*
**Brian M. Peters, Esq.**
*bpeters@postschell.com*
**Kathleen M. Chancler, Esq.**
*kchancler@postschell.com*
**Jonathan B. Sprague, Esq.**
*jsprague@postschell.com*
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
*Attorneys for Defendant Northwestern Medical Center,*
*Inc.*

**Gary D. McQuesten, Esq.**
gary@vdmlaw.com
Valsangiacomi, Detora & McQuesten, P.C.
172 N. Main Street
Barre, VT 05641-0625
*Attorneys for Plaintiff*

**Charles Harvey, Esq.**
*harvey@harveyfrank.com*
Harvey & Frank
Two City Center, 4th Floor
Portland, Maine 04112-0126
*Attorneys for Defendants*
*Jacques M. Archambualt, M.D.; Michael Burfoot, B.M.,*
*B.Ch.; Stephen Mason, M.D.; and James Duncan, M.D.*

**Joseph F. Cahill, Jr., Esq.**
*joecahill@bcgm.net*
Brown, Cahill, Gawne & Miller
42 N. Main Street
St. Albans, VT 05478
*Attorneys for Defendant*
*Northwestern Medial Center, Inc.*

**Michael Honeycutt**
Assistant Registrar
**American University**
Registrar's Office
4400 Massachusetts Ave., NW
Asbury Building, Room 200
Washington, DC 20016-8064

Phillip C. Zane

BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, P.C.
Lincoln Square
555 Eleventh St., NW, 6th Floor
Washington, D.C. 20004
Telephone: (202) 508-3400
E-mail: pzane@bakerdonelson.com

JM 436044 v1

LAW OFFICES
# DAVIS, PARRY & TYLER, P.C.
1525 LOCUST STREET
FOURTEENTH FLOOR
PHILADELPHIA, PENNSYLVANIA  19102-3732

TELEPHONE (215) 732-3755
FACSIMILE (215) 732-0124

LLOYD GEORGE PARRY
ALSO MEMBER OF D.C. BAR

*lgparry@dpt-law.com*
(215) 732-3755 (ext. 209)

January 5, 2007

Office of the Registrar
American University
Asbury Building
4400 Massachusetts Avenue, N.W.
Washington, D.C. 20016-8084

      Re: *Raymond A. Long, M.D. v. Peter A. Hofstetter, et al*
         2:05-CV-21, United States District Court District of Vermont

Dear sir/madam:

      This firm represents plaintiff, Raymond A. Long, M.D., in the above matter before the United States District Court for the District of Vermont, Civil Number 2:05-CV-21.

      Enclosed is a subpoena directing you to produce and provide to us the documents described in the attached "Documents to Be Produced" rider on or before January 19, 2007 at this firm's offices as set forth above. Please complete and forward the enclosed Affidavit with the documents.

      Should you have any questions, please do not hesitate to contact me.

      Sincerely,

      DAVIS, PARRY & TYLER

      Lloyd George Parry, Esquire

cc: w/enc via e-mail only to all counsel

\\Fx2\data\Share\LGP\Long, Ray P-343.1\legal\subpoenas\American University\cover letter.wpd

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# United States District Court

### DISTRICT OF COLUMBIA

Raymond A. Long, M.D.

**SUBPOENA IN A CIVIL CASE**

**V.**

CASE NUMBER:1 2:05-CV-21

Peter A. Hofstetter et al.

District of Vermont

To: Office of the Registrar, American University, Asbury Building,
4400 Massachusetts Avenue, N.W., Washington, D.C. 20016-8084

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): SEE ATTACHED.

| PLACE Davis, Parry & Tyler, 1525 Locust St. 14th Fl. Philadelphia, PA 19102 | DATE AND TIME January 19, 2007 10 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) L. George Parry, Attorney for Plaintiff | DATE January 5, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
L. George Parry, 1525 Locust St., Philadelphia, PA 19102, 215-732-3755

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

ı If action is pending in district other than district of issuance, state district under case number

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                     Date                                    Signature of Server

                                                            _____
                                                            Address of Server

---

RULE 45, Federal Rules of Civil Procedure, Part C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that

person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(vi) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an un-retained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  when information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

DOCUMENTS TO BE PRODUCED

American University

This subpoena requires the production of documents which relate or refer to Peter A. Hofstetter (SSN 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) who purportedly received a B.A. degree in May 1974 and M.P.A. degree in 1977. Such production would include all documents in your possession, custody or control including any personal files of any individual with responsibility regarding the issues inquired into by this Request. Protected Health Information may be redacted from the documents pursuant to the Protective Order entered by the court. (A copy of the Protective Order is attached.)

You are to produce the following:

1.    Copies of any transcripts, evaluations, grades and/or complaints regarding the academic performance or behavior of Peter A. Hofstetter.

2.    Any documents which refer or relate to any disciplinary actions threatened or taken against Peter A. Hofstetter including any investigations, reprimands, probation, suspensions, monitoring, proctoring or termination.

3.    A listing of curricula and courses taken by Peter A. Hofstetter.

4.    Any documents which refer or relate to requests for information about Peter A. Hofstetter from third parties including but not limited to prospective employers, governmental authorities and professional associations.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 AUG 15   PM 10 46

BY _____ CLERK
        DEPUTY CLERK

| | |
|---|---|
| RAYMOND A. LONG, M.D., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| QUORUM HEALTH RESOURCES, L.L.C.; | : |
| NORTHWESTERN MEDICAL CENTER, INC.; | : |
| PETER A. HOFSTETTER; | : |
| JACQUES M. ARCHAMBAULT, M.D.; | : |
| and MICHAEL BURFOOT, B.M., B.Ch., | : |
| | : |
| Defendants. | : **JURY TRIAL DEMANDED** |

No. 2:05-CV-21

## PROTECTIVE ORDER

WHEREAS, discovery in this case, including Interrogatories, Requests for Admissions, Requests for Production and Inspection of Documents and Records, and subpoenas, including those Requests for Production and subpoenas sent to third parties in connection with this litigation, may require the disclosure of confidential trade records, information deemed to be protected health information ("PHI") from any health care provider/covered entity ("covered entity") as provided for in 45 C.F.R. § 160.101 et seq., information protected by an applicable peer review privilege, competitively sensitive and private information which should otherwise remain confidential and the private property and information of the parties, third parties, and other witnesses (collectively, information produced pursuant to this Protective Order shall be referred to as "Confidential Information");

WHEREAS, the confidential business records, trade secrets, competitively sensitive information, PHI and private information of the parties, including documents produced by third parties in connection with this litigation, should be given the protection of an Order of this Court to prevent injury to or an invasion of the confidential and private property of the parties and responding third parties and witnesses by reason of any disclosure; and

WHEREAS, the Court agrees that this Protective Order is appropriate and advisable, pursuant to 45 C.F.R. § 164.512(e), it is hereby

ORDERED that access and dissemination of discovery material shall be governed by the following provisions:

1.    Counsel for the responding party (i.e., Plaintiff, Defendants, Third-Party Defendant, and any Third Party producing documents in connection with this litigation, or Witness) will specifically designate as "confidential" any information which falls within the scope of confidential information recognized by the Courts, including PHI.

(a).    "Confidential" information may include documents, information disclosed in an interrogatory answer or other discovery response, information revealed during a deposition and information otherwise disclosed in discovery, including documents produced by third parties in connection with this litigation. Counsel shall have fifteen (15) days from receipt of any deposition transcript to designate any testimony "confidential."

(b).    Confidential Information shall bear the legend "Confidential Information – Subject to Protective Order" (or a substantial

2

equivalent). Information or documents shall be designated as confidential information only upon the good-faith belief that they fall within the scope of protection afforded by the Courts.

(c).    If counsel for any party believes that the "confidential" designation has been improvidently applied, he/she shall so advise counsel for the producing party in writing. Should counsel for the producing party fail to withdraw the "confidential" designation within fifteen (15) days after receipt of such notice, counsel for the objecting party may bring a motion before the Court to determine whether the information in question is, in fact, Confidential Information that should be protected under this Protective Order. Pending a ruling by the Court on the motion of the objecting party, all information designated as "confidential" shall be governed by the limitations of this Order. Any Confidential Information that is attached to any document filed with the Court shall be filed under seal.

2.    Access to Confidential Information shall be limited to the following designated persons:

(a).    This Court or any other court to which this case may be transferred or any appeal to this litigation that is taken;

(b).    "Counsel", which is defined as outside counsel retained by the parties in this litigation (including outside national and/or insurance counsel) and those employees of outside counsel

3

necessary to assist in this litigation, mediators and/or special masters.

(c).    The parties;

(d).    Independent experts who are to testify (testifying experts) or whose expertise and training is required by the attorneys for the named parties in order to prepare for trial (consulting experts);

(e).    Court and deposition reporters whose services are used in connection with this action and other persons working for such reporters; and

(f).    Witnesses, provided the information is used solely for purposes of this litigation.

3.    Persons described in subparagraphs 2(c), (d) and (f) shall not be given access to Confidential Information unless and until such persons agree to abide by this Protective Order and sign a statement agreeing to be bound by this Protective Order or agree to be bound on the record with regard to persons described in subparagraph 2(f). No party shall be required to reveal the identity of its testifying or consulting experts unless the Court determines that such revelation is required to enforce the provisions of this Protective Order and/or to impose sanctions upon any expert whom the Court determines may have violated his or her attestation. The identity of testifying experts, however, will be provided pursuant to the requirements of the Federal Rules of Civil Procedure or other order of this Court.

4

4.      Confidential Information may be used during the course of any deposition taken in this action, subject to the following conditions: (a) only designated persons as defined in Paragraph 2 may be in attendance at the deposition; (b) the witness is advised on record or in writing of the existence and contents of this Protective Order, and the witness agrees on the record or in writing to be bound by its terms.  If a witness refuses to be bound by this Protective Order, the parties agree to immediately seek a judicial order directing compliance.  If this is not feasible, the examination attorney may still ask questions concerning the documents, although they will not be produced to the witness and the deposition shall be designated under seal until further order of the Court.

5.      All Confidential Information and documents or testimony designated as "confidential" as well as duplicates, notes, memoranda and other documents that disclose, in whole or in part, the contents of confidential materials, shall be maintained in the strictest confidence by the parties and counsel and shall be used solely for purposes of this lawsuit.  Counsel shall keep a record of all copies of Confidential Information made and shall take appropriate precautions to avoid loss and/or inadvertent disclosure of Confidential Information.  However, inadvertent disclosure by a party or any disclosure by any other person bound by this Protective Order of any document or other information during discovery in this action shall be without prejudice to any claims that such material is confidential, privileged or otherwise protected from discovery, and said party shall not be held to have waived any rights by such inadvertent disclosure.

6.      At the conclusion of this litigation (including any and all appeals), Confidential Information, including originals, copies, abstracts or summaries thereof, shall be destroyed or returned  to the attorney for the responding party producing  and

5

providing the Confidential Information, and no copies thereof shall be retained by any other person or entity.

(a).     In any case that Confidential Information is furnished to a testifying or consulting expert, the attorney for the party retaining such expert shall have the responsibility of ensuring that all such Confidential Information, including abstracts and summaries containing such Confidential Information, is returned to the party producing the same or certifying that said Confidential Information has been destroyed.

(b).     Notwithstanding any other item of this Protective Order, counsel for a party may retain abstracts or summaries of Confidential Information which contain counsel's mental impressions or opinions. Such abstracts or summaries shall, however, remain subject to the terms of this Order.

7.     Nothing herein shall be deemed to restrict in any manner the use by any party of (a) its own documents or materials or (b) documents or materials obtained by a party before this Protective Order was signed or without the specific use of this Protective Order.

8.     The purpose of this Protective Order is to expedite the production of documents without resort to a court proceeding; however, the provisions hereof shall not limit or be deemed to waive the right of any party to seek relief from or greater protection than any of the provisions herein.

9.    The parties and/or their counsel are prohibited from using any Confidential Information obtained with this Protective Order for any purpose other than this litigation and any appeals thereof.

10.    Nothing in this Protective Order shall be construed as requiring the production of privileged or otherwise protected documents or information.

11.    Any party may apply to the Court at any time, upon proper notice, for a modification of this Protective Order with respect to the handling of any document or other materials.

12.    In conjunction with the prosecution and/or defense of this litigation and any and all appeals, the parties and/or their counsel are permitted to re-disclose Confidential Information to persons and/or entities, pursuant to terms of this Order, including the following: the Court, any party to the litigation, counsel for any party to the litigation, non-expert witnesses, expert witnesses, counsel for any non-party to the litigation, the insurance carrier(s) for any party to the litigation, or any other person permitted by other order of this Court.

13.    Any person or entity who receives Confidential Information pursuant to this Protective Order must return the Confidential Information or destroy the Confidential Information (including all copies made) at the conclusion of the litigation (including any and all appeals) in accordance with paragraph 6 herein.

14.    After final determination of this litigation, the provisions of this Protective Order shall continue to be binding, and the Court shall retain jurisdiction over the parties for enforcement of its provisions.

POST & SCHELL, P.C.

Brian M. Peters, Esquire
Kathleen M. Chancler, Esquire
Jonathan B. Sprague, Esquire
Mark L. Mattioli. Esquire
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
215-587-1000
Attorneys for Defendants,
Quorum Health Resources, L.L.C.,
Northwestern Medical Center, Inc.,
Peter A. Hofstetter and
Michael Burfoot, B.M., B,C.H.


BROWN, CAHILL, GAWNE & MILLER

Joseph F. Cahill, Jr., Esquire
42 N. Main Street
P.O. Box 810
St. Albans, VT 05478
(802) 524-6211
(802) 476-4181
Attorneys for Defendants,
Quorum Health Resources, L.L.C.,
Northwestern Medical Center, Inc.,
Peter A. Hofstetter and
Michael Burfoot, B.M.. B.C-H.

MURPHY SULLIVAN KRONK

Liam L. Murphy, Esquire
Pamela A. Moreau., Esquire
275 College Street
Burlington, VT 05401
(802) 861-7000
Attorneys for Defendant,
Jacques M. Archambault, M.D.

8

ACKNOWLEDGEMENT OF PROTECTIVE ORDER

I,_____ have read the Protective Order in the matter captioned as Raymond Long, MD. v. Quorum Health Resources, LLC. et al., United States District Court, District of Vermont, Civil Action No. 2:05-CV-21 and agree to be bound by its terms.


_____
_____
_____
[Print Name and Address]

Date:

◯                         ◯

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Raymond A. Long, M.D., | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 2-05-CV-21 |
| Quorum Health Resources, L.L.C., | ) | |
| Northwestern Medical Center, Inc., | ) | |
| Peter A. Hofstetter, Jacques M. | ) | |
| Archambault, M.D. and Michael | ) | |
| Burfoot, B.M., B.C.H., | ) | |
| Defendants | ) | |

## CERTIFICATE OF SERVICE

I, Liam L. Murphy, certify that on the 5th day of August 2005, I sent a copy of the

Protective Order in the above-entitled matter, via U.S. mail, postage prepaid, to the following

parties:

Gary McQuesten, Esq.                    Joseph F. Cahill, Jr., Esq.
Valsangiacomo, Detora & McQuesten, P.C.    Brown, Cahill, Gawne & Miller, P.C.
P.O. Box 625                            P.O. Box 810
Barre, VT 05641-0604                    St. Albans, VT 05478

Lloyd George Perry, Esq.                Brian M. Peters, Esq.
Davis, Parry & Tyler, P.C.              Kathleen M. Chancler, Esq.
1525 Locust Street, 14th Floor          Mark L. Mattioli, Esq.
Philadelphia, PA 19102-3732             Post & Schell
                                        1600 John F. Kennedy Boulevard
                                        Philadelphia, PA 19103-2908


                                        MURPHY SULLIVAN KRONK


                              By:    _____
                                        Liam L. Murphy, Esq.
                                        Pamela A. Moreau, Esq.
                                        275 College Street, P.O. Box 4485
                                        Burlington, VT 05406-4485
                                        (802) 861-7000
                                        Attorney for Jacques M. Archambault, M.D.

SK | MURPHY
     SULLIVAN
     KRONK

00014367

## **A F F I D A V I T**

I, the undersigned, being duly sworn according to law, depose and state that I am duly authorized as the Custodian of Records for UNIVERSITY OF MICHIGAN MEDICAL SCHOOL and that the attached documents respond fully to the subpoena issued for the documents set forth above by counsel for defendant in the matter of Raymond Long, M.D. v. Quorum Health Resources, LLC, Northwestern Medical Center, Inc., Peter A. Hofstetter, Jacques M. Archambault, M.D., and Michael Burfoot, B.M., B.C.H, United States District Court for the District of Vermont, Civil Action Number 3:04-CV-2446.  I further affirm that these documents are true and correct to the best of my knowledge, information and belief.

Executed on:

SIGNED BY:_____

TITLE (PRINT OR TYPE):_____

SWORN TO AND SUBSCRIBED

BEFORE ME THIS          DAY

OF                , 2005

_____
NOTARY

## **AFFIDAVIT**

I, the undersigned, being duly sworn according to law, depose and state that I am duly

authorized as the Custodian of Records for American University and that the attached documents

respond fully to the subpoena issued for the documents set forth above by counsel for plaintiff in

the matter of *Raymond A. Long, M.D. v. Peter A. Hofstetter et al*, United States District Court for

the District of Vermont, Civil Action Number 2:05-CV-21. I further affirm that these documents

are true and correct to the best of my knowledge, information and belief.


Executed on:

SIGNED BY: _____


TITLE (PRINT OR TYPE): _____


SWORN TO AND SUBSCRIBED

BEFORE ME THIS        DAY

OF                  , 2007


_____
NOTARY


\\Fs2\data\Share\LGP\Long, Ray P-343.1\legal\subpoenas\American University\affidavit.wpd

# IN THE UNITED STATES DISTRICT COURT
## OF THE DISTRICT OF VERMONT

**RAYMOND A. LONG, M.D.**
474 Margaret Street, Apt # 76
Plattsburgh, New York 12901

No. 2:05-CV-21

       Plaintiff

**JURY TRIAL DEMANDED**

    vs.

**TRIAD HOSPITALS, INC.**
5800 Tennyson Parkway
Plano, Texas 75024

    and

**QUORUM HEALTH RESOURCES, L.L.C.**
5800 Tennyson Parkway
Plano, Texas 75024

    and

**NORTHWESTERN MEDICAL CENTER, INC.**
133 Fairfield Street
St. Albans, Vermont 05478

    and

**PETER A. HOFSTETTER**
133 Fairfield Street
St. Albans, Vermont 05478

    and

**JACQUES M. ARCHAMBAULT, M.D.**
11 Lost Cove Road
Colchester, Vermont 05446

    and

1



**MICHAEL BURFOOT, B.M., B.C.H.**
**1635 Water Tower Road,**
**Enosburg Falls, Vermont 05450**

    **and**

**JOSEPH SALOMONE, M.D.**
**Doctors Office Commons**
**One Crest Road**
**St. Albans, Vermont 05478**

    **and**

**JAMES DUNCAN, M.D.**
**315 Lost Nation Road**
**Essex Junction, Vermont 05452**

    **and**

**STEPHEN MASON, M.D.**
**24 Dunder Road**
**Burlington, Vermont 05401**

<u>**AMENDED CIVIL ACTION**</u>

<u>**PARTIES**</u>

1.    Plaintiff Raymond A. Long, M.D., is an adult citizen of New York domiciled at 474 Margaret Street, Apartment # 76, Plattsburgh, New York 12901.

2.    Defendant Triad Hospitals, Inc. ("Triad") is a corporation incorporated under the laws of Delaware with its principal place of business at 5800 Tennyson Parkway, Plano, Texas 75024.

3.    Defendant Quorum Health Resources, L.L.C. ("QHR") is a corporation incorporated under the laws of Delaware with its principal place of business at

2

5800 Tennyson Parkway, Plano, Texas 75024.

4.    Defendant Northwestern Medical Center, Inc. ("NMC") is a corporation

incorporated under the laws of Vermont with its principal place of business at 133

Fairfield Street, St. Albans, Vermont 05478.

5.    Defendant Peter A. Hoffstetter ("Hofstetter") is an adult citizen of Vermont

domiciled at Isle La Motte, Vermont with his principal place of business at NMC,

133 Fairfield Street, St. Albans, Vermont 05478.

6.    At all relevant times, Defendant Hofstetter was an employee, agent and/or servant

of Triad and/or QHR, and Chief Executive Officer of NMC, and his actions, as set

forth below, were taken in the scope of his employments and/or agencies and in

bad faith.

7.    Defendant Jacques M. Archambault, M.D. ("Archambault") is an adult citizen of

Vermont domiciled at 11 Lost Cove Road, Colchester, Vermont 05446 with his

principal place of business at 260 Crest View Road, Suite 203, St. Albans,

Vermont 05478.

8.    At all relevant times, Defendant Archambault was a member of the Medical Staff

at NMC engaged in the private practice of orthopedic surgery.

9.    Defendant Michael Burfoot, BM, BCH, ("Burfoot") is an adult citizen of Vermont

domiciled at 1635 Water Tower Road, Enosburg Falls, Vermont 05450, with his

principal place of business at Vermont Managed Care, Burlington, Vermont.

10.    At all relevant times, Defendant Burfoot was Chief of Surgery at NMC, a member

of the Medical Staff at NMC engaged in the private practice of medicine.

3

11.    Defendant Joseph Salomone, M.D. ("Salomone") is an adult citizen of Vermont
domiciled at Alburg, Vermont 05440, with his principal place of business at
Doctors Office Commons, One Crest Road, St. Albans, Vermont 05478.

12.    At all relevant times, Defendant Salomone was a member of the Medical Staff at
NMC engaged in the private practice of medicine.

13.    Defendant James Duncan, M.D. ("Duncan") is an adult citizen of Vermont
domiciled at 315 Lost Nation Road, Essex Junction, Vermont 05452, with his
principal place of business at NMC, 133 Fairfield Street, St. Albans, Vermont
05478.

14.    At all relevant times, Defendant Duncan was a member of the Medical Staff at
NMC engaged in the private practice of medicine.

15.    Defendant Stephen Mason, M.D. ("Mason") is an adult citizen of Vermont
domiciled at 24 Dunder Road, Burlington, Vermont 05401, with his principal
place of business at NMC, 133 Fairfield Street, St. Albans, Vermont 05478.

16.    At all relevant times, Defendant Mason was a member of the Medical Staff at
NMC engaged in the private practice of medicine.

17.    At all relevant times, defendants combined, conspired, confederated and agreed to
act in concert for illegal purposes as set forth below.

**JURISDICTION, VENUE AND JURY DEMAND**

18.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that
the amount in controversy, estimated at minimum to exceed $40,000,000.00,
exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is

4

between citizens of different States.

19.    This Court also has jurisdiction, in part, based on its authority pursuant to 28

U.S.C. § 1337 to hear "any civil action or proceeding arising under any Act of

Congress regulating Commerce or protecting trade and commerce against

restraints and monopolies." Plaintiff brings this action, in part, under § 4 of the

Clayton Act (15 U.S.C. § 4) to recover damages incurred as a result of violations

by defendants of § 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1) and §§ 4 and

16 of the Clayton Act (15 U.S.C. §§ 4 and 16) to secure equitable relief against a

continuation of those violations. In addition, jurisdiction is also founded upon a

violation of federal law, the Federal Health Care Quality Improvement Act of

1986 ("HCQ Act"), 42 U.S.C. §11111 *et seq.* in that defendants conducted a

malicious peer review of Dr. Long for illegal and improper purposes unrelated to

promoting quality health care.

20.    At all relevant times, the actions of defendants as set forth below affected

interstate commerce by their receiving payments from various insurance

programs, purchasing and using goods transported in interstate commerce and

providing services to patients some of whom were from states other than

Vermont. In addition, plaintiff and defendants used and sold products and services

while engaged in the practice of medicine including, but not limited to, the

purchase of malpractice insurance, equipment and other materials which affect the

flow of interstate commerce. Finally, Defendants Triad and QHR, with their

principal places of business in Plano, Texas, took part in the actions as set forth

5



below which occurred in Vermont.

21.    Pursuant to 28 U.S.C. § 1391, venue lies in the District of Vermont because the

events or omissions giving rise to plaintiff's claims occurred therein and certain of

the defendants are domiciled and maintain their principal places of business

therein. Moreover, venue lies in the District of Vermont pursuant to the provisions

of 15 U.S.C. § 22 and 28 U.S.C. § 1391 in that each defendant transacts business,

is registered or licensed to transact business and is found in this district. The

unlawful activities done pursuant to the conspiracy in restraint of trade alleged

herein were carried out within the District of Vermont, and interstate commerce

and trade were and are carried on within this district.

22.    As to each and every cause of action set forth herein, plaintiff demands trial by

jury.

## FACTUAL BACKGROUND

23.    Triad owns and manages hospitals and ambulatory surgery centers in small cities

and selected larger urban markets, currently operating 51 hospitals and 12

ambulatory surgery centers.

24.    QHR is a subsidiary of Triad.

25.    Triad, through QHR, provides consulting and management services to hospitals

and health systems throughout the United States.

26.    NMC is a private, not-for-profit community hospital managed by Triad and/or

QHR pursuant to contract between Triad and/or QHR and NMC.

27.    Pursuant to its management contract, Triad and/or QHR has provided NMC with

6

management services and executive leadership including Defendant Hofstetter, a
Triad and/or QHR employee who serves as NMC's Chief Executive Officer.

28.    Pursuant to its management contract, Triad and/or QHR provided management
services with the intention of enhancing the profitability of NMC.

29.    Dr. Long is a duly licensed physician specializing in orthopedic surgery who has
successfully completed partial non-surgical residency training at Cornell
University Medical Center in New York City and McGill University in Montreal,
Canada.

30.    Dr. Long, a graduate of the University of Michigan Medical School, is highly
trained and skilled in the practice of orthopedic surgery having, *inter alia*,
completed a residency in orthopedic surgery at the University of Montreal, an
Orthopedic Fellowship in Arthroscopy and Arthroplasty at the University of
Montreal, an Orthopedic Fellowship in Shoulder and Elbow Reconstruction at the
Florida Orthopedic Institute and having been inducted as a Fellow of the Royal
College of Surgeons Canada.

31.    Dr. Long is also board certified by the National Board of Medical Examiners and
has successfully completed Part I of his certification by the American Board of
Orthopedic Surgery. He was in the process of obtaining his full certification by the
American Board of Orthopedic Surgery when the events set forth below occurred.

32.    Prior to the illegal, retaliatory and anti-competitive conspiracy alleged herein, Dr.
Long had enjoyed a highly successful career as a physician and orthopedic
surgeon and had every expectation that he would continue to practice his

7

profession successfully and profitably in the future.

33.    In September 2001, Dr. Long began practicing orthopedic surgery as an employee

of Dr. Bruce Foerster ("Foerster") of Northwest Orthopedics, St. Albans,

Vermont.

34.    As a qualified orthopedic surgeon practicing at NMC, Dr. Long was in direct

economic competition with Defendant Archambault.

35.    Defendant Archambault is an orthopedic surgeon with Active Staff Privileges at

NMC who, at all relevant times, offered orthopedic surgical services in the same

geographic area as Dr. Long ("the St. Albans, Vermont market").

36.    As more fully set forth below, in an effort to restrain trade by eliminating

competition by Dr. Long, Defendant Archambault, acting in concert with the other

defendants, falsely, knowingly and maliciously attempted to discredit Dr. Long as

incompetent, unskilled and emotionally disturbed by falsely and maliciously

disparaging Dr. Long throughout NMC and the St. Albans, Vermont market.

37.    As more fully set forth below and as Dr. Long learned over time, Defendant

Archambault was and is an incompetent, negligent and unskilled surgeon who

sought to illegally gain competitive advantage by falsely maligning Dr. Long's

professional reputation.

38.    As more fully set forth below, it is believed and therefore averred that Defendant

Archambault acted in concert with the other defendants to restrain trade and

eliminate Dr. Long as a competitor while simultaneously entering into a business

relationship with NMC whereby the benefits and profits from Archambault's

8

surgical practice would accrue to NMC and, concomitantly, Triad and/or QHR.

39. Effective September 10, 2001, NMC granted Dr. Long Provisional Privileges to perform surgery and otherwise conduct his practice as a surgeon at NMC.

40. Dr. Long's Provisional Privileges were effective for a period of one year.

41. At the end of the one year period of Provisional Privileges, Dr. Long was to apply for Active Staff Privileges by which he would be allowed to perform surgery and otherwise conduct his practice as a surgeon at NMC for a period of two years.

42. Defendant Burfoot, an anesthesiologist, was at that time NMC's Chief of Surgery.

43. At all relevant times, Defendants Burfoot and Mason were partners with Dr. William Roberts ("Roberts") and Dr. Roland Adamsons ("Adamsons") in a group anesthesiology practice with Active Staff Privileges at NMC.

44. At all relevant times, Defendants Burfoot and Archambault were close associates and personal friends.

45. On or about January 25, 2002, Dr. Long performed arthroscopic surgery on the shoulder of Patient A at NMC.

46. As part of the aforesaid surgery, Roberts, an anesthesiologist at NMC, administered an interscalene nerve block.

47. Within twenty-four hours of undergoing surgery, Patient A became quadriplegic in that he was paralyzed in all four extremities.

48. Medical testing and a formal neurologic consultation conducted at Dr. Long's direction confirmed that Patient A's quadriplegia resulted from the interscalene nerve block performed by Roberts.

9

49.  Dr. Long advised Patient A that his quadriplegia was caused by the interscalene nerve block performed by Roberts.

50.  Dr. Long believes and therefore avers that Patient A's quadriplegia was proximately caused by the negligent, incompetent and improper administration of the interscalene nerve block by Roberts.

51.  Plaintiff requested that the Surgical Service Subcommittee for Quality Assurance ("SSSQA") review Patient A's surgery and perform a root cause analysis as to all possible causes of Patient A's quadriplegia.

52.  In contrast, Roberts repeatedly attempted to mislead Patient A into believing that his paralysis had been caused by surgical error instead of the anesthetic complication as confirmed by neurological consultation.

53.  On or about January 27, 2002, Dr. Long prepared to perform a complex emergency surgery at NMC.

54.  As was his practice, prior to the patient being delivered to the operating room, Dr. Long began setting up the operating room and conducting a dry run of the surgery to make sure that all necessary instruments were in place and to minimize the possibility of error during complex emergency surgery.

55.  As Dr. Long was setting up the operating room and conducting the dry run, Defendant Burfoot, NMC's Chief of Surgery and the anesthesiologist on the case, brought the patient into the operating room.

56.  Dr. Long asked Defendant Burfoot to remove the patient since Dr. Long was still setting up the operating room and conducting a dry run of the surgery.

57. Defendant Burfoot refused to remove the patient and allow Dr. Long to complete setting up the operating room.

58. Despite Defendant Burfoot's actions, Dr. Long proceeded with and performed the surgery successfully.

59. During the surgery, Dr. Long advised Defendant Burfoot that Burfoot had acted inappropriately and unprofessionally.

60. Defendant Burfoot angrily stated, *inter alia*, that Dr. Long should "stop fucking around!"

61. After the surgery, Dr. Long reported Defendant Burfoot's unprofessional conduct to Foerster who was the Orthopedic Surgery representative to the SSSQA.

62. Subsequently, Foerster advised Defendant Burfoot that Burfoot had acted unacceptably and unprofessionally.

63. Subsequently, Defendant Burfoot and Sandra Chagnon ("Chagnon"), NMC's Surgical Services Nurse Manager, complained to Defendant Hofstetter about Dr. Long.

64. On or about February 1, 2002, in an effort to conciliate Defendant Burfoot, Dr. Long discussed with Burfoot the aforesaid incident prior to the January 27, 2002 surgery.

65. At that time and place, Dr. Long suggested that he and Defendant Burfoot put the incident behind them.

66. Unknown to Dr. Long, as NMC's Chief of Surgery, Defendant Burfoot made quarterly reports concerning Dr. Long's conduct and performance.

11

67.   After Dr. Long spoke with Defendant Burfoot in the aforesaid conciliatory fashion, Burfoot's next quarterly report noted approvingly that Dr. Long had spontaneously sought out Burfoot to resolve their differences.

68.   Thereafter, Defendant Burfoot's quarterly reports stated that Dr. Long's relationships with operating room staff had "dramatically improved".

69.   Dr. Long continued to see Patient A in follow up.

70.   Though Patient A's quadriplegia improved, he continued to be greatly debilitated by his remaining paresis.

71.   Patient A advised Dr. Long that he was unable to work and, therefore, was unable to pay his surgery bills.

72.   Dr. Long asked Roberts, former Secretary to the Medical Staff and Chief of NMC's Anesthesia Department, to arrange for the cancellation of Patient A's bill from NMC.

73.   Subsequently, Roberts stated that he had arranged through Defendant Hofstetter to cancel Patient A's bill from NMC.

74.   Nevertheless, despite Patient A's paresis and inability to work (caused by the improperly performed interscalene nerve block), NMC continued to bill for his surgery.

75.   Dr. Long asked Roberts for a copy of Patient A's bill from NMC in order to review and possibly reduce the bill.

76.   Roberts refused to produce a copy of the bill.

77.   On or about March 30, 2002, Dr. Long advised Patient A that his paresis was

12

caused by an anesthetic complication and that Dr. Long would prefer that Patient A bring an action for medical malpractice rather than have his life financially destroyed.

78.    On or about March 31, 2002, Dr. Long informed Roberts, Defendant Burfoot's partner, that Dr. Long had advised Patient A as set forth in the preceding paragraph.

79.    Given Patient A's catastrophic result, Dr. Long became concerned about the severity of risk posed to his patients by the use of interscalene nerve blocks by the anesthesiologists at NMC.

80.    Consequently, shortly after Patient A became paralyzed, Dr. Long asked Roberts what the complication rate at NMC was for interscalene nerve blocks.

81.    Roberts was evasive and did not answer Dr. Long's questions concerning the complication rate at NMC for interscalene nerve blocks.

82.    Dr. Long also asked Roberts' and Defendant Burfoot's partner, Dr. Roland Adamsons ("Adamsons"), if he was familiar with the type of anesthesia related complication that had resulted in Patient A's paralysis and subsequent paresis.

83.    Like Roberts, Adamsons was evasive and claimed never to have heard of such a complication.

84.    On September 10, 2002, Dr. Long's one year Provisional Privileges were due to expire.

85.    In violation of NMC's Medical Staff by-laws, Dr. Long was not provided with the necessary documents to apply for Active Staff Privileges.



86.    On or about October 23, 2002, Dr. Long performed emergency surgeries on Patient B and Patient C.

87.    Patient B had suffered a fractured femur and fractured elbow.

88.    Patient C had suffered a fractured femur.

89.    The emergency surgeries were difficult and lasted all night.

90.    After working through the night, Dr. Long required assistance to complete the emergency surgeries.

91.    The orthopedic surgeon on call at NMC was Defendant Archambault.

92.    Defendant Archambault took over part of Patient C's surgery and incompetently, negligently and improperly positioned a surgical nail over Patient C's femur, pounded it and split the femur making Patient C's condition worse.

93.    Dr. Long immediately relieved Defendant Archambault, repaired the damage done by Archambault, and successfully completed the surgery.

94.    Upon exiting the operating room and subsequently, Defendant Archambault falsely, maliciously and hypocritically attempted to blame Dr. Long for the surgical error committed by Archambault.

95.    Dr. Long did not complete Patient B's and Patient C's emergency surgeries until late morning on October 24, 2002.

96.    Patient B's and Patient C's emergency surgeries had disrupted NMC's elective surgical schedule costing NMC lost profits from those privately paid surgeries.

97.    Moreover, since Patient B and Patient C were Medicaid patients, their emergency surgeries had reduced NMC's profit margin.

14

98.   Dr. Long told Chagnon that he intended to consult with Foerster as to whether or

      not it might be necessary to return Patient B for additional emergency surgery to

      improve his chances of full recovery.

99.   Shortly thereafter, Defendant Hofstetter angrily confronted Dr. Long inside the

      surgical suite and instructed him not to return Patient B to the operating room

      since to do so would further disrupt NMC's elective surgical schedule.

100.  Dr. Long advised Defendant Hofstetter that NMC had an "emergency room" sign

      out front, emergency surgeries take precedence over elective surgeries and the

      elective surgeries would have to be postponed if - after consultation with Foerster

      - Dr. Long made the medical decision to perform additional emergency surgery on

      Patient B.

101.  Defendant Hofstetter was totally unqualified to make a medical decision as to

      whether or not Patient B required further emergency surgery.

102.  Defendant Hofstetter's prohibition on further emergency surgery was motivated

      by Hofstetter's desire to maximize NMC's profits in total disregard for Patient

      B's welfare.

103.  On or about September 10, 2002, Dr. Long's provisional privileges at NMC

      expired.

104.  On numerous occasions, Dr. Long inquired of Defendant Hofstetter as to when his

      Active Staff privileges would be advanced.

105.  Defendant Hofstetter declined to directly answer Dr. Long's inquiries and,

      instead, advised Dr. Long to speak with Hofstetter's assistant, Marilyn Fairbanks

15

("Fairbanks").

106.    On numerous occasions, Dr. Long inquired of Fairbanks as to when his Active

Staff privileges would be advanced.

107.    Fairbanks, too, was evasive and declined to answer Dr. Long's inquiries.

108.    On or about December 3, 2002, Dr. Long received a letter signed by, among

others, Defendants Hofstetter and Burfoot stating that due to several reviews of

Dr. Long's surgical cases by the SSSQA, a recommendation concerning his

Active Staff Privileges by Defendant Burfoot could not be made.

109.    NMC's Medical Staff by-laws required Dr. Long's application for Active Staff

Privileges to include a letter of recommendation from Defendant Burfoot as

NMC's Chief of Surgery.

110.    Pending further review of Dr. Long's Active Staff Privileges, NMC extended Dr.

Long's Provisional Privileges until January 10, 2003.

111.    On or about December 2, 2002, Defendant Burfoot, in his capacity as NMC's

Chief of Surgery, wrote to Dr. Edward Haak, Chairman of NMC's Credentials

Committee, ("Haak") falsely asserting that Dr. Long lacked technical competence

as a surgeon.

112.    Defendant Burfoot's letter to Haak was false, malicious, defamatory, in bad faith

and calculated to wrongfully harm Dr. Long economically, professionally and in

his reputation.

113.    By writing directly to Haak, Defendant Burfoot had acted outside established peer

review procedures and not for the purpose of promoting quality health care.

16



114. At approximately the same time, Defendant Hofstetter spoke with Foerster, Dr. Long's employer, and, without basis, questioned Dr. Long's technical skill and competence as a surgeon.

115. On or about December 4, 2002, Foerster advised Dr. Long that Defendant Hofstetter, citing unspecified complaints about Dr. Long, had decided to deny Dr. Long Active Staff Privileges at NMC.

116. Pursuant to the Medical Staff Bylaws and operating procedures, Defendant Hofstetter had no authority to deny Dr. Long Active Staff Privileges.

117. During the first and second weeks of December 2002, Dr. Long met at various times with Defendants Hofstetter and Burfoot in an effort to resolve the issue of Dr. Long's Active Staff Privileges.

118. At the aforesaid meetings, Defendants Hofstetter and Burfoot admitted, *inter alia*, the following:

   a. None of Dr. Long's surgeon colleagues had expressed any concern regarding Dr. Long's technical skills or professional competence;

   b. NMC had received no complaints concerning Dr. Long from his patients, families of patients, NMC's Emergency Department personnel, NMC's Medical Surgical personnel or physicians in the community;

   c. As verified by Defendant Burfoot's Quarterly Reports, alleged concerns about Dr. Long's interpersonal relations with operating room personnel had long been satisfactorily resolved and there were no complaints from operating room personnel.

17

119.  At the aforesaid meeting, neither Defendant Hofstetter nor Defendant Burfoot were able to cite any specifics supporting their conclusion that Dr. Long was not a proficient and skilled surgeon save for one vague allusion by Defendant Burfoot to Dr. Long's ability to properly perform arthroscopy.

120.  Defendant Burfoot is not an orthopedic surgeon and is totally unqualified to render an opinion on plaintiff's skills as an arthroscopist.

121.  Defendant Burfoot's vague allusion as aforesaid was based, at least in part, on the false and malicious campaign of disparagement against Dr. Long being waged by Defendant Archambault.

122.  At the aforesaid meeting, Defendant Hofstetter advised Dr. Long that even if the SSSQA were to favorably review Dr. Long's surgical cases, a recommendation from Defendant Burfoot for advancement of Dr. Long's Active Staff Privileges might not be forthcoming due to so-called "squishy stuff".

123.  Despite Dr. Long's requests for clarification, Defendant Hofstetter did not define what he meant by "squishy stuff" saying only that Hofstetter was unsure about Dr. Long's surgical results and that Dr. Long "did not fit in" at NMC.

124.  Denial of Active Staff Privileges at NMC would result in Dr. Long suffering grave economic loss and damage to his reputation and severely impair his ability to obtain either employment as a surgeon or privileges at other health care facilities.

125.  At the aforesaid meeting, Defendants Hofstetter and Burfoot acknowledged that denial of Dr. Long's Active Staff Privileges by NMC would effectively destroy Dr. Long's career as an orthopedic surgeon.

18

126. On or about December 19, 2002, the SSSQA met to review three of Dr. Long's surgeries including that of Patient A.

127. By the time of the SSSQA meeting, Dr. Long had learned of two interscalene nerve blocks (in addition to Patient A's) performed by Roberts which had produced major complications.

128. At the SSSQA meeting, Dr. Long requested written information as to the complication rates of each anesthesiologist at NMC relative to the performance of interscalene nerve blocks.

129. Dr. Long made the aforesaid request since it was and is his professional responsibility to his patients to have such information.

130. Roberts was the representative of NMC's Anesthesia Department to the SSSQA and was present in that capacity at the meeting.

131. Since the SSSQA was reviewing, *inter alia*, the interscalene nerve block administered by Roberts to Patient A, Roberts' purported peer review of his own work constituted a blatant conflict of interest.

132. Nevertheless, Defendant Salomone, as chairman of the SSSQA, permitted Roberts to peer review his own case.

133. Dr. Long directly asked Roberts what his complication rate was in performing interscalene nerve blocks.

134. Roberts was evasive and declined to answer Dr. Long's questions concerning Roberts' complication rate.

135. Dr. Long presented to the SSSQA his research on the complication rates at other

19

health care facilities which demonstrated that Roberts' three known complications appeared to represent a high trend.

136. Dr. Long pointed out to the SSSQA that Patient A had suffered a catastrophic injury as the result of Roberts's administration of the interscalene nerve block.

137. Dr. Long demanded that the complication rates of Roberts and the other anesthesiologists at NMC (including Defendants Burfoot and Mason) be disclosed to him.

138. Dr. Long pointed out that, in order to protect his patients' well-being and to obtain valid informed consent from his patients, it was his duty as a surgeon to learn the anesthesiologists' complication rates.

139. Dr. Long then left the SSSQA meeting.

140. After Dr. Long left, Roberts became visibly angry and upset because Dr. Long had requested the complication rates.

141. NMC's SSSQA determined that all of Dr. Long's surgical cases which had been submitted for review had met the applicable standard of care.

142. The complication rates of NMC's anesthesiologists continue to be closely guarded secrets which have yet to be disclosed to Dr. Long.

143. On or about December 20, 2002, Defendants Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously and in bad faith published a false and defamatory letter to, among others, the Credentialing Committee and the Medical Executive Committee ("MEC") recommending that Dr. Long not be granted

20

Active Staff Privileges since Dr. Long had exhibited "severe behavioral disturbances that have adversely affected patient care."

144. Defendants Burfoot and Hofstetter, acting within the scope of their agencies and employments by NMC and/or Triad and/or QHR, intentionally, wrongfully, maliciously and in bad faith published the aforesaid false and defamatory letter to members of the Credentialing Committee and MEC and other persons not belonging to those committees.

145. Defendants Burfoot and Hofstetter published the aforesaid false and defamatory letter by sending copies to the aforesaid committee members without any advisory on the copies or envelopes that the letter was to be treated as confidential.

146. The aforesaid false and defamatory letter was published in bad faith and outside the course of established peer review procedures in that it was read and reviewed by persons other than the members of the aforesaid committees.

147. It is believed and therefore averred that Defendants Burfoot and Hofstetter, acting within the scope of their agencies and employments, intentionally, wrongfully, maliciously and in bad faith published the aforesaid false and defamatory letter in retaliation for Dr. Long having demanded the complication rates of NMC's anesthesiologists and for Dr. Long having advised Patient A to bring legal action for medical malpractice and demanding cancellation of Patient A's hospital bill.

148. It is believed and therefore averred that Defendants Burfoot and Hofstetter, acting within the scope of their agencies and employments, intentionally, wrongfully, maliciously and in bad faith published the aforesaid false and defamatory letter for

21

purposes of disparaging Dr. Long pursuant to the conspiracy to restrain trade and eliminate Dr. Long as a competitor to Defendant Archambault.

149.    The aforesaid false and defamatory letter falsely, maliciously and publicly portrayed Dr. Long as mentally unstable, unfit to practice his profession and dangerous to patients.

150.    As intended, Defendants Burfoot and Hofstetter's publication of the aforesaid defamatory letter wrongfully harmed and damaged Dr. Long's reputation in the St. Albans, Vermont market and among his peers, held him up to ridicule, contempt and disrepute and wrongfully damaged Dr. Long professionally, economically and emotionally as more fully set forth below.

151.    On or about December 24, 2002, Dr. Long - who at that time was unaware of the aforesaid false and defamatory letter of December 20, 2002 - wrote to Defendants Hofstetter and Burfoot memorializing the aforesaid meeting with Hofstetter and Burfoot and demanding a fair hearing pursuant to the Medical Staff Bylaws for a corrective action to redress, *inter alia*, Hofstetter's unwarranted, malicious and unauthorized threat to withhold advancement of Dr. Long's Active Staff Privileges.

152.    In his letter, Dr. Long pointed out that Defendant Burfoot had by-passed peer review procedures by writing directly to Haak as chairman of the Credentials Committee to impugn Dr. Long's fitness to practice medicine.

153.    In his letter, Dr. Long reiterated that, because of Defendants Hofstetter and Burfoot's wrongful actions, Dr. Long was faced with the destruction of his

22


professional career based on unspecified "perceptions" of unidentified individuals outside Dr. Long's peer group and Defendant Hofstetter's unspecified and so-called "squishy stuff".

154. At no time have defendants replied to or refuted Dr. Long's December 24, 2002 letter.

155. The Medical Staff Bylaws provide for a Fair Hearing Plan whereby an aggrieved physician is entitled to the convening of a jury of impartial persons drawn from the community and one representative of NMC. The jury is to review the grievance and render a binding decision as to whether or not corrective action should be taken to redress the grievance.

156. On or about December 30, 2002, Defendant Hofstetter wrongfully denied Dr. Long's demand for a fair hearing pursuant to the Medical Staff Bylaws.

157. On or about January 3, 2003, Dr. Long learned for the first time of the aforesaid false and defamatory letter of December 20, 2002.

158. At that time, Dr. Long read the aforesaid false and defamatory letter which had been placed in his personnel file.

159. Dr. Long demanded that NMC provide him with a copy of the aforesaid false and defamatory letter.

160. Defendant Hofstetter wrongfully refused to release a copy of the false and defamatory letter to Dr. Long.

161. For purposes limited to identification and authentication, Dr. Long, in the presence of witnesses, affixed his signature to the aforesaid false and defamatory

23

letter and requested that it be preserved.

162.    On or about January 6, 2003, Dr. Long wrote to Defendant Hofstetter protesting the aforesaid defamatory letter as false, demanding that the letter be removed from Dr. Long's personnel file, demanding that Defendant Burfoot be removed from Dr. Long's credentialing process and further demanding that the Credentials Committee be allowed to make its recommendation to the MEC concerning Dr. Long's Active Staff Privileges "based on established fact."

163.    Dr. Long further demanded that, if Defendant Burfoot was not removed from the credentialing process and the Credentials Committee was not permitted to proceed on the basis of the information available from the regular peer review process, Dr. Long wanted a fair hearing under the Medical Staff Bylaws.

164.    On or about January 7, 2003, Defendant Hofstetter wrote to Dr. Long wrongfully denying Dr. Long's demand that Defendant Burfoot be removed from the credentialing process and Dr. Long's demand for a fair hearing.

165.    On or about January 7, 2003, as Dr. Long was in the operating room immediately prior to performing a complex emergency surgery, Dr. Long was abruptly summoned to Defendant Hofstetter's office.

166.    In Defendant Hofstetter's office, Defendant Hofstetter told Dr. Long that Dr. Long could either resign from NMC or Defendant Hofstetter would retain prominent legal counsel to force Dr. Long's resignation and destroy his professional career.

167.    Defendant Hofstetter falsely claimed that he had "a stack of complaints" against Dr. Long.

24

168. Though Dr. Long demanded to see the complaints, Defendant Hofstetter was unable to produce a single complaint.

169. Dr. Long refused to resign and returned to the operating room.

170. As a result of Defendant Hofstetter's well-timed threats, Dr. Long was upset as he performed the complex emergency surgery and a surgical complication resulted.

171. It is believed and therefore averred that Defendant Hofstetter, acting in the scope of his employments and agencies, threatened Dr. Long as aforesaid to further the goals of the aforesaid conspiracy in restraint of trade and in retaliation for Dr. Long's having demanded release of the aforesaid anesthesiology complication rates, requesting cancellation of Patient A's bill, having advised Patient A to bring a medical malpractice action and for the purpose of trying to provoke Dr. Long into making a surgical error which would result in a surgical complication that could then be used as grounds to deny Active Staff Privileges and otherwise provoke Dr. Long into manifesting "severe behavioral disturbances" that would adversely affect patient care to generate after the fact support for the aforesaid false, malicious and defamatory letter.

172. In late December 2002, Dr. Long met with Haak, Chairman of the Credentialing Committee, to express his concerns as to the wrongful actions of Defendants Hofstetter and Burfoot as aforesaid.

173. Subsequently, the Credentialing Committee, without recommendation, referred Dr. Long's credentialing process directly to the MEC.

174. On or about January 20, 2003, Dr. Long met with the MEC as part of his

25

credentialing process.

175. At the aforesaid meeting, Dr. Long stated that it had always been his understanding that, in order to properly promote patient safety and welfare, the Quality Assurance peer review process had to be a forum for open and honest exchanges among physicians concerning patient healthcare without fear of retaliation for the views expressed.

176. Dr. Long related to the MEC his concerns about patient safety as it related to the anesthesia complication rate at NMC and the aforesaid wrongful, malicious, retaliatory and bad faith actions taken against him by defendants including the aforesaid false and defamatory letter of December 20, 2002.

177. Dr. Long stated that the aforesaid false and defamatory letter was an obvious retaliation for Dr. Long having exposed Roberts' high complication rate and having pressed for release of the complication rates of all of the anesthesiologists at NMC.

178. Dr. Long further stated that defendants were retaliating because he had pressed for release of NMC's anesthesia complication rate, requested cancellation of Patient A's bill and had advised Patient A to bring a medical malpractice action.

179. Dr. Long presented to the MEC a formula, documented in the medical literature, demonstrating that surgical complications vary in direct proportion to the level of adversity (defined as any event or circumstance that distracts the surgeon including emotional distress, anger, inadequate staff and improper instrumentation) encountered by the surgeon.

26

180.   Dr. Long told the committee how Defendant Hofstetter had abruptly summoned him from the operating room to threaten Dr. Long and force Dr. Long to resign from NMC.

181.   Dr. Long told the committee how he had returned to the operating room upset by Defendant Hofstetter's threats and how, consistent with the aforesaid formula, a surgical complication had resulted.

182.   Defendant Hofstetter was present at the MEC meeting.

183.   Dr. Long addressed Defendant Hofstetter asking if Hofstetter thought it appropriate to threaten a surgeon immediately prior to surgery and warned Hofstetter that his behavior posed a danger to patient safety.

184.   Dr. Long then left the meeting.

185.   Subsequently, the MEC removed Defendants Hofstetter and Burfoot from any further involvement in Dr. Long's credentialing process.

186.   Following his removal, Defendant Hofstetter on numerous occasions became visibly angry, upset and enraged whenever Dr. Long's name was mentioned in his presence.

187.   On or about February 10, 2003, Dr. Long met with the MEC at which time he presented proof of his surgical skills and advised that he would not resign from NMC.

188.   At that meeting, Dr. Long invited the MEC to have his surgical cases reviewed by outside experts in orthopedic surgery.

189.   As part of the credentialing process, the SSSQA reviewed Dr. Long's surgical

27

cases and determined that those cases met the applicable standard of medical care.

190.    NMC's MEC - minus Defendants Hofstetter and Burfoot - unanimously voted to grant Dr. Long full, unrestricted Active Staff Privileges.

191.    Subsequently, NMC's Board of Governors voted unanimously to grant Dr. Long full, unrestricted Active Staff Privileges.

192.    On or about February 25, 2003, NMC granted Dr. Long full, unrestricted Active Staff Privileges.

193.    Pursuant to the Medical Staff Bylaws, Active Staff Privileges are to be effective for a period of two years.

194.    Around the time Dr. Long received full, unrestricted Active Staff Privileges, Adamsons, a partner of Defendant Burfoot and Roberts, initiated a series of professionally substandard and antagonistic incidents which were directed against Dr. Long and Dr. Long's patients.

195.    Dr. Long complained to Dr. Leonard Tremblay ("Tremblay"), Chairman of the MEC, about Adamsons' unprofessional actions.

196.    Dr. Long advised Tremblay that the aforesaid incidents were brazen attempts to provoke an intemperate reaction by Dr. Long in order to retrospectively justify the aforesaid false and defamatory letter which falsely and maliciously alleged that Dr. Long had exhibited "severe behavioral disturbances that adversely affected patient care" and to cause surgical complications, to make plaintiff's practice of medicine at NMC untenable, all in violation of the Medical Staff Bylaws and in illegal restraint of trade.

28

197.    On or about April 8, 2003, at the recommendation of Tremblay, plaintiff advised

Defendant Salomone, Chairman of the SSSQA that the aforesaid incidents were

brazen attempts to provoke an intemperate reaction by Dr. Long in order to justify

retrospectively the aforesaid false and defamatory letter of December 20, 2002, to

cause Dr. Long to commit surgical errors which would result in surgical

complications and to make Dr. Long's practice of medicine at NMC untenable, all

in violation of the Medical Staff Bylaws.

198.    On or about April 8, 2003, Dr. Long hand delivered to Defendant Salomone a

letter setting forth the aforesaid incidents.

199.    At that time, Dr. Long discussed with Defendant Salomone the contents of the

letter.

200.    In his letter, Dr. Long detailed various incidents of professionally substandard and

antagonistic conduct by Adamsons including, *inter alia*, the following:

a.    On or about January 22, 2003, after being paged eight times without

response, Adamsons arrived two hours late at the operating room to

anesthetize one of Dr. Long's patients, an eight year old child with a

severe limb-threatening elbow fracture, despite the fact that the patient

required emergency surgery. Dr. Long cited Adamsons' delay in such an

emergency as "unacceptably dangerous".

b.    On or about February 22, 2003, in a loud and angry manner, Adamsons

verbally attacked and abused Dr. Long in public as Dr. Long was

simultaneously treating three severely injured patients.

29

c.    On or about February 25, 2003, Adamsons performed a nerve block on Dr.
Long's surgical patient in contravention of Dr. Long's directions. The
nerve block needlessly and dangerously complicated Dr. Long's ability to
assess the patient's post-operative neurological condition and necessitated
that Dr. Long use an alternative surgical method less medically desirable
than the one precluded by the nerve block.

d.    On or about March 21, 2003, Adamsons negligently contaminated the
sterile surgical field immediately prior to Dr. Long starting surgery. After
the sterile field was re-established, Adamsons then re-contaminated the
surgical field.

201.   In his letter, Dr. Long advised that Adamsons' and others' substandard,
unprofessional and antagonistic conduct as aforesaid endangered patient welfare
and constituted calculated attempts to anger and provoke Dr. Long to exhibit
intemperate reactions which could then be characterized as "severe behavioral
disturbances" in a transparent, after-the-fact effort to substantiate the false and
malicious averments in Defendant Burfoot's December 20, 2002 letter and to
cause complications that could later be used against Dr. Long when consideration
was given to advancement of his Active Staff Privileges.

202.   In his letter, Dr. Long demanded that the situation be promptly corrected in order
to assure protection for Dr. Long and Dr. Long's patients.

203.   Dr. Long further demanded that the SSSQA be convened to address the aforesaid
incidents in light of Defendant Burfoot's December 20, 2002 letter and the danger

30

they posed to patients.

204.  Subsequently, Dr. Long made numerous written demands that the aforesaid false and defamatory letter be removed from his personnel file and that affirmative steps be taken to end the aforesaid dangers to patient safety and welfare.

205.  Dr. Long further demanded that NMC have a representative of the Joint Commission for the Accreditation of Health Organizations ("JCAHO") review the circumstances under which the aforesaid false and defamatory letter had been published and to monitor the fair hearing and Quality Assurance process that he had requested.

206.  NMC, acting through the MEC and at Defendant Hofstetter's direction, declined to remove the aforesaid false and defamatory letter from Dr. Long's personnel file.

207.  Defendants took no disciplinary action against Adamsons and others as aforesaid to deter or discourage further actions which posed a threat to the welfare and safety of Dr. Long's patients.

208.  Consequently, Dr. Long repeatedly requested a fair hearing pursuant to the Medical Staff Bylaws to refute the aforesaid false and defamatory letter and, as a matter of patient safety, to end the ongoing efforts to antagonize and anger Dr. Long into exhibiting intemperate reactions which could then be characterized as severe behavioral disturbances adversely affecting patient care and to cause surgical complications in Dr. Long's patients.

209.  Despite Dr. Long's repeated demands, he was not granted a fair hearing and no

31

steps were taken to deter or discourage the aforesaid provocative actions by Adamsons and others which posed a danger to patient safety and welfare.

210. In his April 8, 2003 letter to and discussion with Defendant Salomone, Dr. Long demanded that the case of surgical Patient D be referred to NMC's SSSQA for peer review.

211. Adamsons, who was partners with Burfoot, Mason and Roberts, had administered a right-sided interscalene nerve block to Patient D by inserting a needle into her neck at the cervical spine level of C6-7.

212. Patient D had reported excruciating pain radiating down her right side at the moment when Adamsons inserted the needle into her neck as he attempted the interscalene nerve block.

213. In the post-operative period, following the interscalene nerve block administered by Adamsons, Patient D reported difficulty using her right hand.

214. Patient D had developed an acute focal neurological deficit involving the right upper extremity which was determined by neurological consultation to be a central nervous system lesion.

215. An MRI of Patient D's cervical spine demonstrated a "linear transverse focus" consistent with a needle track at the same cervical level where Adamsons had inserted the needle.

216. The aforesaid needle track extended into Patient D's spinal cord resulting in a syrinx consistent with a hemorrhage in the spinal cord substance.

217. Prior to referring Patient D's case to the SSSQA, Dr. Long had reviewed the

32

aforesaid findings and MRI with Adamsons and asked him whether he believed that Patient D's complication could have been caused by the interscalene nerve block he performed.

218.    Adamsons refused to answer Dr. Long's questions concerning the possible cause of Patient D's complication.

219.    In his April 8, 2003 letter to and discussion with Defendant Salomone, Dr. Long had explained that Patient D had undergone an interscalene nerve block administered by Adamsons and had developed an acute focal neurological deficit involving the right upper extremity which was determined by neurological consultation to be a central nervous system lesion.

220.    Dr. Long further advised Defendant Salomone that Patient D had reported excruciating pain radiating down her right side at the moment when Adamsons inserted the needle into her neck as he attempted the interscalene nerve block.

221.    Dr. Long further explained to Defendant Salomone that an MRI of Patient D's cervical spine demonstrated a "linear transverse focus" consistent with a needle track at the same cervical level where Adamsons had inserted the needle.

222.    Dr. Long further explained to Defendant Salomone that the aforesaid needle track extended into Patient D's spinal cord resulting in a syrinx consistent with a hemorrhage in the spinal cord substance.

223.    Dr. Long had previously provided to the SSSQA peer reviewed medical literature on interscalene nerve blocks including a review article with the rate of anesthetic complications arising from interscalene nerve blocks and a review article of

33

several patients sustaining acute traumatic needle injury to the cervical spine with resultant focal neurological deficits and MRI findings similar to that of Patient D.

224. As aforesaid, at the December 19, 2002 meeting of the SSSQA, Dr. Long had previously requested the rate of complications arising from interscalene nerve blocks performed at NMC.

225. Defendant Salomone advised Dr. Long that Dr. Long would be invited to present the entire contents of his April 8, 2003 letter - including Patient D's case - to the SSSQA.

226. Contrary to Defendant Salomone's assurances, Dr. Long heard nothing more about the disposition by the SSSQA or any other Medical Staff committee of the matters set forth in his letter.

227. Contrary to Defendant Salomone's assurances, Dr. Long was not provided with the rate of complications arising from interscalene nerve blocks performed at NMC.

228. Unknown to Dr. Long, Defendant Salomone convened the SSSQA with the participation of Roberts (the partner of Adamsons, Burfoot and Mason).

229. Under the guidance of Defendant Salomone, the SSSQA permitted Adamsons to participate in the review of the matters set forth in Dr. Long's letter.

230. Under the guidance of Defendant Salomone, the SSSQA exonerated Adamsons regarding his unprofessional behavior including his contamination of surgical cases and failure to respond to the aforesaid emergency pages.

231. Contrary to the assurances of Defendant Salomone, the SSSQA did not permit Dr.

34



Long to appear or participate in the review.

232.    The SSSQA, under Defendant Salomone's guidance and with Roberts'

participation, failed to conduct any legitimate investigation of Patient D's

complication.

233.    The SSSQA, under Defendant Salomone's guidance, contrary to the evidence and

the supplied medical literature and despite the fact that Patient D had no pre-

existing neurological problems with the right upper extremity, purported to

conclude that Patient D's complication was related to pre-existing cervical

pathology.

234.    At no time did defendants conduct a legitimate root cause analysis of the injury to

Patient D despite its severity.

235.    As set forth in the aforesaid medical literature previously provided by Dr. Long,

Patient D's MRI was consistent with the MRI findings of patients who had

suffered needle injury during the improper performance of interscalene nerve

blocks.

236.    Aware that NMC would have Patient D's original digital MRI file, Dr. Long had

retained custody in his private office of the original printed MRI which

demonstrated the needle track and hemorrhage in Patient D's spinal cord.

237.    On or about November 6, 2003, without Dr. Long's permission or knowledge,

NMC employee Sheila Gregoire ("Gregoire") wrongfully and illegally entered Dr.

Long's private office and removed Patient D's original printed MRI which

demonstrated the needle track and hemorrhage in Patient D's spinal cord.



238.  On or about November 10, 2003, Dr. Long became aware that Gregoire had

illegally and without permission entered his office and removed Patient D's

original printed MRI.

239.  On or about November 10, 2003, a member of Dr. Long's office staff contacted

Gregoire and requested the return of Patient D's MRI.

240.  Gregoire did not return Patient D's original MRI which demonstrated the needle

track and hemorrhage in Patient D's spinal cord.

241.  Gregoire provided an altered copy of Patient D's MRI in which, *inter alia*, the

needle track had been deleted.

242.  In early 2002, Dr. Long had been granted temporary privileges at Littleton

Regional Medical Center in New Hampshire ("LRMC") to assist a colleague in a

series of complex surgeries.

243.  At that time, NMC had provided a letter of good standing attesting to LRMC that

Dr. Long, *inter alia*, suffered no physical or mental defects and was in good

standing at NMC.

244.  In Summer 2003, Dr. Long was asked to return to LRMC to perform additional

complex surgeries.

245.  Defendant Hofstetter arbitrarily, capriciously and without justification refused to

send LRMC a letter of good standing as previously provided.

246.  Dr. Long met with Defendant Hofstetter to discuss Hofstetter's refusal to provide

the letter of good standing as before at which time Defendant Hofstetter again

insisted that Dr. Long resign from NMC saying that Dr. Long did not fit in at



NMC despite the fact that Dr. Long had been granted full, unrestricted Active Staff Privileges.

247. When Dr. Long refused to resign, Defendant Hofstetter angrily asked Dr. Long, "Aren't you afraid of me?"

248. Dr. Long replied that he was not afraid of Defendant Hofstetter, would not resign and stated that Hofstetter was bound by NMC's Bylaws under which Dr. Long and his patients had rights.

249. Defendant Hofstetter angrily exclaimed that he was not subject to the Bylaws.

250. In early July, 2003, NMC required Dr. Long to re-apply for Active Staff Privileges even though those privileges had been granted in February 2003 for a period of two years.

251. Although Dr. Long protested, he was nevertheless required to submit to the re-credentialing process even though he had approximately eighteen months left on his Active Staff Privileges.

252. In early July 2003, at the initiation of Foerster, a meeting was convened at NMC to address the aforesaid events including, *inter alia*, Defendant Burfoot's defamatory letter and issues surrounding the safety and welfare of Dr. Long's patients.

253. Dr. Long, Dr. Long's legal counsel, Defendant Hofstetter, Defendant Salomone, legal counsel for the MEC and others attended the aforesaid meeting.

254. At that meeting, Dr. Long stated that, in derogation of patient safety, Defendant Hofstetter and others acting at his direction were attempting to provoke Dr. Long

37

as aforesaid into exhibiting intemperate reactions which could then be characterized as "severe behavioral disturbances" in order to justify and substantiate after the fact the aforesaid false and defamatory letter and to cause surgical complications in Dr. Long's patients.

255. Dr. Long also demanded that the aforesaid false and defamatory letter be removed from his personnel file and that prompt action be taken to deter or discourage further provocative actions as aforesaid which posed a danger to his patient's safety and welfare.

256. Defendants at the meeting assured Dr. Long that the welfare and safety of his patients would be preserved at all times.

257. At that meeting, legal counsel to the MEC recommended removal of the false and defamatory letter from Dr. Long's personnel file.

258. Nevertheless, at Defendant Hofstetter's direction and in violation of its Bylaws, NMC illegally and in bad faith continues to retain the aforesaid false and defamatory letter in Dr. Long's personnel file.

259. As Dr. Long's re-credentialing process was underway, Defendant Hofstetter, acting in the scope of his agencies and employments by Triad and/or QHR and NMC, arbitrarily, wrongfully, in bad faith, in furtherance of the goals of the aforesaid conspiracy in restraint of trade and for retaliatory purposes directed that Dr. Long be referred to the SSSQA for review of three of his surgical cases.

260. Defendant Hofstetter well knew or reasonably should have known the following:

   a.    The first referred case did not even involve one of Dr. Long's patients;

38

b.  The surgery in the second referred case had been performed by a surgeon other than Dr. Long. Dr. Long had seen the patient only in follow up;

c.  The third case involved a mother accused of twice breaking her infant's arm who attempted to shift blame for re-breaking her child's arm to Dr. Long by falsely claiming that Dr. Long had removed the cast from the first break too early. As Defendant Hofstetter well knew, the second break had previously been determined by law enforcement to be the result of child abuse and not error by Dr. Long.

261.  As Defendant Hofstetter well knew or reasonably should have known, no basis existed for referring Dr. Long or the aforesaid cases to the SSSQA.

262.  On or about September 16, 2003, Dr. Long's counsel wrote to NMC's counsel citing concern for the safety of Dr. Long's patients, protesting the unwarranted referral of Dr. Long to the SSSQA and asking NMC's counsel to share the protest with NMC's Board of Governors and to "put an end to this foolishness."

263.  Despite Defendant Hofstetter's wrongful efforts, Dr. Long's re-application for Active Staff Privileges was unanimously approved by the MEC and the Board of Governors.

264.  On or about October 23, 2003, Dr. Long was once again granted full, unrestricted Active Staff Privileges.

265.  On or about September 19, 2003, at NMC, Defendant Archambault began a total surgical hip replacement on Patient E.

266.  Three qualified medical experts had recommended against the aforesaid surgery

which was unnecessary and not indicated by Patient E's clinical diagnosis.

267. In his preoperative history and physical report, Defendant Archambault wrongfully omitted any reference to the aforesaid expert opinions recommending against the surgery.

268. During the surgery, Defendant Archambault negligently, incompetently and severely fractured Patient E's femur.

269. During the surgery, Defendant Archambault negligently and incompetently twice cemented into place an improperly positioned prosthesis.

270. Defendant Archambault then summoned Dr. Long to the operating room.

271. Defendant Archambault told Dr. Long that he could not figure out how to position the prosthesis and asked Dr. Long to do it for him.

272. Dr. Long took over the surgery and, to the extent possible, corrected Defendant Archambault's negligent and incompetent errors.

273. Subsequent to the surgery, Defendant Archambault made false statements in the operative report to give the false and misleading impression that Patient E had suffered metallosis, a condition which would have justified the surgery.

274. In fact, as Defendant Archambault well knew or reasonably should have known, there was no evidence of metallosis and the surgery was totally unnecessary.

275. Defendant Archambault wrongfully omitted from the operative report any reference to Dr. Long's participation in the surgery.

276. As Defendant Archambault well knew or reasonably should have known, the surgery that he incompetently performed on Patient E was totally unwarranted.

40

277.    Nevertheless, it is believed and therefore averred that Defendant Archambault knowingly, falsely, maliciously, in bad faith and in furtherance of the goals of the aforesaid conspiracy in restraint of trade advised the MEC that none of the other orthopedic surgeons at NMC would assist Dr. Long in surgery.

278.    In approximately November 2003, Dr. Long observed Defendant Archambault in possession of x-rays pertaining to certain of Dr. Long's patients.

279.    At that time, Defendant Archambault advised that he was performing a peer review of Dr. Long's surgeries on those patients.

280.    It is believed and therefore averred that Defendant Archambault did not review Dr. Long's surgical cases as part of any established peer review process pursuant to the Medical Staff Bylaws.

281.    Similarly, in an effort to cause Dr. Long professional harm and to eliminate him as a competitor, Defendant Archambault knowingly, falsely and maliciously advised the mother of one of Dr. Long's minor patients that, if she allowed Dr. Long to operate on her son, the result would be disastrous.   Defendant Archambault knowingly, falsely and maliciously told Patient F, one of Dr. Long's surgical patients, that Dr. Long had botched Patient F's surgery and caused him to develop arthritis.

282.    Thereafter, Defendant Archambault performed surgery on Patient F

283.    Defendant Archambault falsely, wrongfully and maliciously executed an operative report pertaining to Patient F's surgery in which he falsely reported that Dr. Long had improperly placed a screw in Patient F's ankle joint.

41

284. As Defendant Archambault well knew or reasonably should have known, Dr. Long had never placed a screw in Patient F's ankle joint.

285. Defendant Archambault's actions as aforesaid were undertaken to publicly, falsely and maliciously harm Dr. Long's personal and professional reputation and to destroy his surgical practice.

286. For the reasons set forth below, it is believed and therefore averred that Defendant Archambault's actions against Dr. Long as aforesaid were undertaken in concert with the other defendants to, *inter alia*, advance their conspiracy in restraint of trade.

287. On or about October 21, 2003, as Dr. Long was performing a critical aspect of a complex surgery in the vicinity of the patient's axillary nerve, he was interrupted by Chagnon who urgently insisted that Defendant Hofstetter had to speak with Dr. Long.

288. Dr. Long refused to interrupt the surgery for the purpose of speaking with Defendant Hofstetter.

289. Once the surgery was completed, Dr. Long contacted Defendant Hofstetter who then stated falsely that Dr. Long had not paid his hospital pager bill.

290. Defendant Hofstetter subsequently threatened to have Dr. Long's pager cut off, a serious consequence given that Dr. Long had to be on call for medical emergencies and his patients.

291. As Defendant Hofstetter well knew or reasonably should have known, Dr. Long's pager bill had been paid through 2005.

42

292.   It is believed and therefore averred that, by having Chagnon interrupt Dr. Long at

a critical point in a complex surgery over what turned out to be a false and

insignificant claim that Dr. Long had not paid his pager bill, Defendant Hofstetter

was attempting to harass and provoke Dr. Long into exhibiting an intemperate

response which could then be characterized as a severe behavioral disturbance,

create adversity that would increase the likelihood of Dr. Long committing a

surgical error that would result in a complication and inducing Dr. Long to resign

from NMC.

293.   By letter dated December 11, 2003, Dr. Long's counsel, again citing concern for

the safety and welfare of Dr. Long's patients, demanded an immediate fair hearing

to address, *inter alia*, the aforesaid disruptions created by Defendants Hofstetter,

and Burfoot.

294.   In that letter, Dr. Long's counsel, in the interest of patient welfare and safety,

requested the involvement of JCAHO and Defendant QHR.

295.   On or about November 12, 2003, unknown to Dr. Long at that time and with no

prior warning, discussion or justification, Defendant Hofstetter, NMC employee

Mark Sutton ("Sutton") and Gregoire wrongfully, maliciously, illegally and in

violation of the Medical Staff Bylaws, caused a large printed notice to be publicly

posted in NMC's Diagnostic Imaging Library stating the following:

EFFECTIVE IMMEDIATELY

DR. LONG MAY NOT SIGN OUT ANY JACKETS FROM

THE FILM LIBRARY. IF YOU HAVE ANY PROBLEMS

43

WITH HIM ON THIS MATTER PLEASE REFER IT TO

MARK AND IF HE IS NOT AVAILABLE REFER IT TO

PETER HOFSETTER (sic).

296.   Dr. Long did not learn of the public notice until December 25, 2003, when he

attempted to remove from the library x-rays for the purpose of obtaining a second

opinion regarding possible emergency surgery on a 95 year old patient who had

suffered a fractured hip.

297.   At that time, technician Bonnie Day ("Day") regretfully advised Dr. Long that he

was prohibited from signing out the x-rays and brought to his attention the

aforesaid publicly posted notice.

298.   Dr. Long, without complaint or argument, copied the publicly posted notice and

notified Tremblay in his capacity as Chairman of NMC's MEC.

299.   The aforesaid notice, prominently displayed in NMC's Diagnostic Imaging

Library, in effect directed that Dr. Long could not remove diagnostic images such

as x-rays, MRI's and CT scans from the library and constituted a serious

impairment of Dr. Long's full and unrestricted Active Staff Privileges in violation

of NMC's Bylaws.

300.   The wrongful and unwarranted restriction against Dr. Long signing out x-rays

constituted a serious impediment to Dr. Long's ability to render proper patient

care and posed a threat to the welfare and safety of Dr. Long's patients.

301.   It is believed and therefore averred that the aforesaid public notice was calculated

by Sutton, Gregoire and Defendant Hofstetter to embarrass and defame Dr. Long,

subject Dr. Long to ridicule, raise unfounded questions concerning Dr. Long's fitness to practice his profession, severely impede his ability to efficiently practice his profession, provoke him into exhibiting an intemperate reaction which could then be characterized as a severe behavioral disturbance, create adversity that would increase the likelihood of Dr. Long committing surgical error, induce Dr. Long to resign from NMC and generate a written record of an adverse event.

302.    On or about December 26, 2003, at Defendant Hofstetter's direction, Gregoire and Sutton aggressively interrogated Day concerning Dr. Long's reaction when Dr. Long became aware of the aforesaid publicly posted notice.

303.    Despite Day's insistence that Dr. Long had reacted calmly, Gregoire and Sutton repeatedly urged her to falsely report that Dr. Long had reacted to the public notice by using profanity and behaving in an intemperate, angry and inappropriate manner.

304.    Gregoire and Sutton also repeatedly urged Day to state that Dr. Long had been aware of the public notice at least three weeks prior to December 25, 2003.

305.    Day refused to do so and stated the truth, i.e. that Dr. Long had been calm and polite when he became aware of the aforesaid publicly posted notice and that, to her knowledge, Dr. Long had not seen the notice prior to December 25, 2003.

306.    Subsequent to this initial interrogation, Gregoire and Sutton twice more subjected Day to interrogations in which they insisted that Day sign a statement falsely alleging that Dr. Long had seen the public notice at least three weeks prior to December 25, 2003 and had reacted to the public notice by using profanity and

45

behaving in an intemperate, angry and inappropriate manner.

307. Each time she was interrogated and subjected to this unwarranted pressure, Day refused to be intimidated and repeated again and again that Dr. Long had remained calm and polite and, to her knowledge, had not seen the public posting prior to December 25, 2003.

308. On or about December 26, 2003 and subsequently, Dr. Long's counsel repeatedly demanded in telephone conferences with NMC's counsel that the posting be removed and that an immediate fair hearing be convened.

309. By letter dated December 29, 2003, Dr. Long's counsel, again citing concern for the safety and welfare of Dr. Long's patients, amended the aforesaid December 11, 2003 demand for an immediate fair hearing to address the arbitrary reduction of Dr. Long's privileges at NMC including, *inter alia*, the aforesaid posting that Dr. Long had discovered on December 25, 2003.

310. Dr. Long's counsel demanded that NMC immediately grant Dr. Long a fair hearing to address the aforesaid wrongful, vindictive and disruptive actions by defendants and demanded that the aforesaid public notice be removed, that Dr. Long be permitted to have ready access to x-rays, and that JCAHO be brought to NMC to review all of the aforesaid actions by defendants.

311. NMC neither granted Dr. Long's many demands for an immediate fair hearing nor removed the posting which constituted a reduction in Dr. Long's privileges and which adversely affected patient welfare and safety.

312. By letter dated December 31, 2003, Dr. Long's counsel renewed the demands for

46

an immediate fair hearing and immediate removal of the posting.

313.    On or about December 31, 2003, in a letter marked confidential and hand

delivered to Dr. Long by Defendant Hofstetter's personal assistant, Gregoire

falsely accused Dr. Long of signing out and holding for an inordinate period of

time seven x-ray files.

314.    As Gregoire well knew or reasonably should have known, her accusation was

false in that five of the subject x-ray files had never been signed out by Dr. Long

and the other two had been returned by Dr. Long to the library within the

customary time period.

315.    It is believed and therefore averred that Gregoire's letter was an attempt instigated

by Sutton, Gregoire and Defendant Hofstetter to meretriciously justify their

wrongful, unwarranted and unjustified posting of the humiliating and defamatory

public notice, to harass, embarrass, humiliate, anger, antagonize and provoke Dr.

Long and to create a dated written record of an event that would cause adversity to

a surgeon as aforesaid.

316.    On or about December 31, 2003, the radiology posting was taken down.

317.    On or about January 9, 2004, Dr. Long performed a complex emergency surgery

for a fractured shoulder.

318.    Following the aforesaid surgery, Dr. Long requested that post-operative x-rays of

the shoulder be taken in the recovery room.

319.    At that time, Dr. Long was advised of a new reduction of his privileges in that he

would not be permitted to have the post operative x-rays without signing a special

47

form.

320. The requirement that he sign a form before being granted access to x-rays was a restriction unique to Dr. Long and constituted an impairment of his full and unrestricted Active Staff Privileges in violation of the Medical Staff Bylaws.

321. The wrongful and unwarranted restriction that only Dr. Long be required to sign out x-rays constituted an impediment to his ability to render proper patient care.

322. It is believed and therefore averred that the aforesaid restriction was calculated by Sutton, Gregoire and Defendant Hofstetter to cause a disruption between Dr. Long and the staff of NMC's Diagnostic Imaging Department that could later be blamed on Dr. Long, impede his ability to efficiently practice his profession, provoke him into exhibiting an intemperate reaction which could then be characterized as a severe behavioral disturbance, create adversity that would increase the likelihood of Dr. Long committing surgical error, induce Dr. Long to resign from NMC and generate a written record of an adverse event.

323. On or about December 9, 2003, Dr. Long performed open shoulder surgery on Patient G and arthroscopic shoulder surgery on Patient H.

324. On or about December 23, 2003, Dr. Long performed shoulder arthroscopic surgery on Patient I and Patient J.

325. In late December 2003 and early January 2004, Dr. Long became aware that Patient G, Patient H and Patient I had developed life and limb threatening post-surgical infections.

326. Patient G and Patient H's surgeries had become infected with the deadly

48

bacterium *Staphylococcus aureus*.

327. Patient I's surgery had become infected with the deadly water-borne bacteria *Serratia marcescens* and *Pseudomonas aeruginosa*.

328. Dr. Long is a fellowship trained shoulder surgeon whose professional reputation is based in large part on his ability to safely perform shoulder surgery.

329. Dr. Long had never before had a shoulder arthroscopic surgery result in an infection and believed such a complication to be exceedingly rare.

330. Prior to the aforesaid infections, Dr. Long had experienced a zero percent rate of post surgical infections in shoulder surgeries.

331. Patient I's infection was confirmed to have been caused by the bacteria *Serratia* and *Pseudomonas*.

332. Infections by both *Serratia* and *Pseudomonas* have never been described in the medical literature as a complication of shoulder arthroscopy.

333. Dr. Long reviewed the medical literature and consulted with an infectious disease expert to confirm that *Serratia* and *Pseudomonas* are water-borne organisms.

334. Accordingly, Dr. Long was able to determine that Patient I's infection was caused by water-borne organisms.

335. Unknown to Dr. Long, in the months leading up to the aforesaid infected surgeries, NMC had purchased and possessed the deadly bacteria *Staphylococcus aureus* and *Pseudomonas aeruginosa*.

336. Dr. Long advised the staff at NMC, including Defendants Duncan and Salomone, that Patient I's infection was caused by water-borne organisms.

337.　During 2002, NMC experienced an outbreak of infections affecting orthopedic surgery patients other than those of Dr. Long.

338.　In response to the aforesaid outbreak of infections not involving Dr. Long's patients, NMC had consulted an outside sterility and infectious disease expert.

339.　Given the life and limb threatening nature of his patients' infections, Dr. Long notified Defendants NMC and Salomone of the infections and demanded a full root cause analysis pursuant to the standards promulgated by JCAHO including the immediate participation of the same outside sterility and infectious disease expert who had previously been engaged by NMC.

340.　Dr. Long further demanded that all materials used in the surgery at NMC, including the irrigation solutions, be tested for contamination.

341.　Dr. Long further demanded that the infected cases be immediately referred for review by the SSSQA.

342.　On or about January 5, 2004, Defendant NMC wrongfully, maliciously, illegally and in violation of the Medical Staff Bylaws, denied Dr. Long's repeated demands for a fair hearing.

343.　By letters dated January 6, 2004, January 19, 2004 and January 24, 2004, Dr. Long's counsel, citing previous as well as additional illegal reductions of Dr. Long's privileges, repeatedly renewed the demand for a fair hearing.

344.　In the aforesaid letters, counsel cited repeated concern for patient safety and demanded that JCAHO and that Defendant QHR be notified of the aforesaid events.

345. In the aforesaid letters, counsel demonstrated the blatant falsity of Gregoire's accusation pertaining to the allegedly missing x-ray files.

346. By letter dated January 12, 2004, to Defendant Salomone in his capacity as chairman of the SSSQA and citing concern for patient safety and welfare, Dr. Long demanded an investigation of, *inter alia*, Defendant Hofstetter's actions against Dr. Long as aforesaid, the aforesaid radiology posting, Gregoire's false accusations concerning missing x-ray files and the life threatening infections as aforesaid.

347. In the aforesaid letter, Dr. Long demonstrated, *inter alia*, the blatant falsity of Gregoire's accusation concerning the missing x-ray files.

348. In support of the letter, Dr. Long also provided extensive documentary proof of its contents as well as a copy of his April 8, 2003 letter in which he demanded, *inter alia*, the removal of Defendant Burfoot's false and defamatory letter from his file.

349. On or about January 22, 2004, Defendant Salomone convened a meeting of the SSSQA and acknowledged that he had received Dr. Long's January 12, 2003 letter with supporting documents.

350. Dr. Long's letter and documents pertained, in part, to life-threatening infections which had occurred at NMC and which Dr. Long demanded that SSSQA immediately investigate.

351. Despite the ongoing to risk to patient safety and welfare posed by the life-threatening infections, Defendant Salomone, citing lack of time, did not distribute to the SSSQA Dr. Long's letter and supporting documents.

51

352.  Despite the ongoing to risk to patient safety and welfare posed by the life-
      threatening infections, the SSSQA, under the guidance of Defendant Salomone,
      did not even consider - much less investigate - the life-threatening infections or
      any other documented concern raised by Dr. Long.

353.  Instead of an investigation of these matters, on or about January 26, 2004, a
      newly-constituted MEC chaired by Defendant Duncan (and attended by
      Defendants Hofstetter and Salomone) met to consider Dr. Long's letter and
      supporting documents.

354.  At that meeting, the MEC, under the guidance of Defendant Duncan,
      acknowledged receipt of the documents pertaining to the reductions of Dr. Long's
      privileges and the life-threatening infections occurring in his patients.

355.  The MEC, under the guidance of Defendant Duncan,  further acknowledged Dr.
      Long's repeated demands for a fair hearing.

356.  The MEC, under the guidance of Defendant Duncan,  expressed concern that Dr.
      Long had contacted JCAHO and that JCAHO would conduct an unannounced
      inspection of NMC.

357.  Despite the matters raised and documented by Dr. Long, the MEC, under the
      guidance of Defendant Duncan, acknowledged the defamatory letter by Defendant
      Burfoot and NMC's possible legal liability for this letter.

358.  Instead of conducting an investigation of the aforesaid documented matters or
      granting Dr. Long a fair hearing, as was his right, the MEC, under the guidance of
      Defendant Duncan, without foundation and in bad faith queried whether they

52

could compel Dr. Long to undergo a psychiatric evaluation.

359. NMC, in disregard for patient safety and welfare, refused to consult outside experts or test for contamination or conduct any legitimate investigation of the life-threatening infections or the documented and wrongful reductions in Dr. Long's privileges despite the fact that they represented a threat to patient safety and welfare.

360. At approximately the same time, at a medical conference in Florida, Dr. Long discussed the case histories of the infected surgeries and sought the advice of various conference attendees.

361. The aforesaid conference attendees recommended, *inter alia*, that Dr. Long have the irrigation solution used in surgeries at NMC sterility tested and that Dr. Long should look closely for signs of tampering or sabotage of that solution.

362. Upon returning to NMC from Florida, Dr. Long reiterated to the NMC staff, including Chagnon, Defendant Salomone, and NMC employee Richard Lamb, an infection control nurse, that Patient I's infection had been caused by water-borne organisms.

363. Dr. Long also demanded that NMC test the surgical irrigating solutions for contamination and that outside sterility experts be brought in to investigate the infections and that NMC perform a root cause analysis pursuant to the standards promulgated by JCAHO.

364. NMC, in disregard for patient safety and welfare, refused to consult outside experts, test for contamination or conduct any legitimate investigation into how

53



the infections had occurred.

365.  Upon returning to NMC from the Florida medical conference, Dr. Long successfully implemented temporary steps to prevent infection in the remaining surgeries that he would perform at NMC.

366.  The aforesaid steps consisted of selecting disposable items to be used in a surgery immediately before the surgery began, sterilization of surgical instruments immediately before the surgery began instead of days in advance, and changing the irrigation solution from that provided in advance to a different solution.

367.  After Dr. Long implemented these countermeasures, Dr. Long's surgical infection rate returned immediately to zero.

368.  Dr. Long continued to demand a fair hearing to refute the aforesaid false and defamatory letter by Defendant Burfoot, to have that letter removed from his personnel file and to address the many violations of the Medical Staff Bylaws which constituted reductions in Dr. Long's Active Staff Privileges and a danger to patient safety and welfare.

369.  On or about February 4, 2004, Dr. Long attended a meeting with the MEC at which time Defendant Duncan proposed a sixty day "cooling off" period during which he would serve as liaison between Dr. Long and Defendant Hofstetter.

370.  Defendants Duncan and Salomone assured Dr. Long that he would be permitted to safely practice surgery without interference or harassment by Defendant Hofstetter or others.

54

371.  At that meeting, Dr. Long offered to meet with Defendant Hofstetter to resolve any outstanding issues or differences.

372.  Dr. Long was advised that Defendant Hofstetter would never accept Dr. Long's offer to meet and discuss the matter.

373.  At the meeting, Dr. Long also demanded to know what steps were being taken to investigate the life-threatening surgical infections and was told that whether to conduct such an investigation was under review.

374.  During that meeting, Dr. Long demanded to see the aforesaid false and defamatory letter.

375.  Defendant Duncan produced a copy of a letter which had been changed in order to be less defamatory, i.e., *inter alia*, "severe behavioral disturbances that have adversely affected patient care" had been changed to "severe behavioral problems in the operating room".

376.  Dr. Long noted that his counter-signature as aforesaid was missing from the letter.

377.  Dr. Long advised the attendees that the letter before them was not the aforesaid false and defamatory letter originally published by Defendants Hofstetter and Burfoot.

378.  Dr. Long demanded to see the original letter that he had signed.

379.  Defendant Duncan refused Dr. Long's demand to see the original letter.

380.  Dr. Long's demand for a fair hearing was also refused, and Defendant Duncan advised, instead, that the aforesaid "cooling off period" would prevail.

381.  On or about February 6, 2004, as Dr. Long prepared to perform arthroscopic

55

shoulder surgery, mindful of the advice he had received at the Florida medical conference and of the fact that no investigation had been undertaken of the aforesaid life-threatening infections, Dr. Long instructed the circulating nurse to obtain a sample of the irrigation solution provided by NMC for his surgery.

382.    As was the case on December 23, 2003, when the infected surgeries were caused by water borne bacteria, Dr. Long was the only surgeon utilizing lactated ringers solution that day.

383.    Instead of using the lactated ringers solution from which the sample had been drawn, Dr. Long instructed the circulating nurse to obtain and use new solution.

384.    Dr. Long then safely and successfully performed the surgery.

385.    Dr. Long submitted the sample to Fletcher Allen Health Care ("FAHC") for testing.

386.    On or about February 8, 2004, FAHC advised  Dr. Long that testing conclusively established that the sample of irrigation solution was heavily contaminated with coagulase positive *Staphylococcus aureus*, a deadly infectious agent.

387.    On or about February 9, 2004, Dr. Long's legal counsel reported the aforesaid surgical infections and the testing results to governmental authorities.

388.    Subsequent testing of NMC's irrigation solutions revealed that the contamination of the solution provided by NMC for plaintiff's surgery on February 6, 2004, had not occurred at the manufacturing facility.

389.    Moreover, the deadly coagulase positive *Staphylococcus aureus* contaminating the irrigation solution provided for the February 6, 2004 surgery is neither a water-

56

borne organism nor typically an accidental contaminant of surgical solutions.

390. As was the case on December 23, 2003, when the infected surgeries were caused by water-borne bacteria, Dr. Long was the only surgeon utilizing lactated ringers solution that day at NMC.

391. Had Dr. Long used the lactated ringers irrigation solution originally provided by NMC on February 6, 2004, his patient would have suffered a life-threatening infection.

392. The aforesaid protective measures taken by Dr. Long, including changing the irrigation solution at the time of surgery, prevented infection from occurring. Unknown to Dr. Long, by letter dated March 8, 2004 to Defendant Duncan, Defendant Hofstetter wrongfully and without justification requested that Defendant Duncan consider initiating a corrective action against Dr. Long pursuant to the Medical Staff Bylaws falsely alleging disruptions of NMC's surgical and radiology departments by Dr. Long and citing the fact that NMC was under investigation by the Vermont Attorney General's Office.

393. As Defendant Hofstetter well knew or should have known, his referral of Dr. Long for corrective action was completely without justification, in bad faith, false and malicious.

394. In his referral of Dr. Long for corrective action, Defendant Hofstetter attached a false and malicious report by Chagnon that the infected surgeries had been performed after Dr. Long had become aware of the publicly posted notice in the Diagnostic Imaging Library on December 25, 2003.

395.   As Defendant Hofstetter well knew or reasonably should have known, the infected surgeries were performed before Dr. Long became aware of the aforesaid publicly posted notice.

396.   Defendant Hofstetter's referral of Dr. Long for a corrective action was made not to promote quality healthcare but to further the aforesaid conspiracy in restraint of trade and to retaliate for Dr. Long's having demanded release of the aforesaid anesthesiology complication rates, having requested cancellation of Patient A's bill, having advised Patient A to bring a medical malpractice action, having reported NMC to the Attorney General's Office and JCAHO and for the purpose of embarrassing and harassing Dr. Long, provoking Dr. Long to manifest intemperate reactions which could then be characterized as severe behavioral disturbances adversely affecting patient care to generate after-the-fact support for the aforesaid false and malicious defamatory letter.

397.   In that letter, Defendant Hofstetter linked the disruptions that defendants had caused to Dr. Long's medical practice to the life-threatening infections which had occurred in Dr. Long's patients.

398.   Defendant Hofstetter attached to that letter, *inter alia*, Chagnon's report in which she falsely, maliciously and wrongfully stated, *inter alia*, that "in the span of time from 1/5/04 to 1/16/04 Dr. Long had two shoulder surgeries that became infected. One was a pinning and the other an arthroscopy."

399.   As Chagnon well knew or reasonably should have known, no such surgeries had become infected.

58

400.   By falsifying the dates of the allegedly infected surgeries, Chagnon wrongfully and maliciously created the false appearance that Dr. Long had performed surgeries that became infected after his documented discovery of the aforesaid radiology posting on December 25, 2003 and his receipt of Gregoire's false letter dated December 31, 2003.

401.   As Chagnon well knew or reasonably should have known, the infected surgeries had occurred on December 9, 2003 and December 23, 2003, prior to Dr. Long's discovery of the aforesaid radiology posting and receipt of the aforesaid letter from Gregoire.

402.   As Chagnon well knew or reasonably should have known, none of the infections had occurred during a pinning operation.

403.   Both of the referenced infections occurred during arthroscopic shoulder surgery.

404.   By falsifying the type of surgery that had become infected (i.e., the pinning), Chagnon falsely and maliciously eliminated the irrigation solution and instruments used during arthroscopy and open shoulder surgery as common denominators in the infected surgeries.

405.   By falsely and deceptively eliminating the irrigation solutions and instruments as common denominators, Chagnon falsely and maliciously attempted to isolate and portray Dr. Long as the single common denominator in the infected surgeries.

406.   Subsequently, on March 25, 2004, Chagnon falsely and maliciously advised the MEC during its corrective action investigation of Dr. Long that Dr. Long was the only common denominator in the infected surgeries.

59

407. In her report, Chagnon, falsely, maliciously and wrongfully stated, *inter alia*, that the measures taken by Dr. Long to successfully prevent the recurrence of infections were extreme, made "no sense in regard to the prevention of infection", and increased the risk of infection.

408. As Chagnon well knew or should have known, the measures taken by Dr. Long were successful in preventing further infections and were in no way extreme.

409. In her report, Chagnon, falsely, maliciously and wrongfully stated, *inter alia*, that Dr. Long had caused two nurses to resign.

410. As Chagnon well knew, the referenced nurses resigned due to working conditions prevailing in NMC's operating room caused by persons - including Chagnon - other than Dr. Long.

411. Unknown to Dr. Long, on March 12, 2004, Defendant Duncan convened a meeting of the MEC wherein Defendant Hofstetter's request for a corrective action against Dr. Long was initiated.

412. At that meeting, Defendant Duncan appointed Defendant Salomone to convene an Ad Hoc Committee ("AHC") to conduct the investigation.

413. At no time did any of the defendants notify Dr. Long that he was under investigation.

414. On the contrary, Defendant Duncan had assured Dr. Long that there was a "cooling off" period in effect wherein, if Defendant Hofstetter had a problem with Dr. Long, that concern would be conveyed to Dr. Long by Defendant Duncan.

415. Contrary to the terms of the aforesaid "cooling off" period, Defendant Duncan did

60

not advise Dr. Long of Defendant Hofstetter's March 8, 2004 letter.

416.   Unknown to Dr. Long, Defendant Duncan maliciously and wrongfully conducted a secret proceeding whereby Defendant Salomone appointed the AHC.

417.   Defendant Salomone included among the members of the AHC Defendant Mason, who was partners with Burfoot, Roberts and Adamsons.

418.   On or about March 12, 2004, Defendant Salomone convened a meeting of the AHC.

419.   At that meeting, Defendant Mason maliciously, wrongfully and falsely represented, *inter alia*, that he had no conflict of interest and could conduct the investigation of Dr. Long fairly and impartially.

420.   As Defendant Salomone well knew or should have known, Defendant Mason had a glaring conflict of interest in that he was partners with Burfoot, Roberts and Adamsons all of whom Dr. Long had cited as aforesaid.

421.   At that meeting, Defendant Mason maliciously, wrongfully and falsely represented, *inter alia*, that Dr. Long was technically incompetent as a surgeon.

422.   At that meeting, Chagnon falsely, maliciously and wrongfully represented that Lamb had thoroughly investigated the aforesaid infections.

423.   As Chagnon well knew or should have known, no legitimate investigation of the infections had occurred.

424.   At that meeting, Chagnon falsely, maliciously and wrongfully represented that Dr. Long was an incompetent surgeon.

425.   At that meeting, Defendant Salomone falsely, maliciously and wrongfully

61

represented that laboratory testing did not support Dr. Long's report that the

irrigation solution provided by NMC for Dr. Long's surgery on February 6, 2004

was contaminated.

426.    As Defendant Salomone well knew or should have known, laboratory testing of

the aforesaid irrigation solution demonstrated heavy contamination with 800

colony forming units per milliliter of the deadly bacterium coagulase positive

*Staphylococcus aureus*.

427.    On March 15, 2004, Defendant Salomone re-convened the AHC.

428.    Dr. Sobel, a psychiatrist at NMC, attended that meeting as a consultant.

429.    Gregoire, Sutton, Chagnon and Defendant Salomone falsely and maliciously

misrepresented their interactions with Dr. Long and the history of the aforesaid

infections.

430.    Based on the aforesaid false and malicious misrepresentations, the AHC

recommended that Dr. Long undergo a psychiatric examination.

431.    At no time was Dr. Long made aware that the AHC was investigating his conduct.

432.    At no time was Dr. Long afforded the opportunity to appear before the AHC to

confront or question his accusers or to meet with the AHC to present the facts

pertaining to the aforesaid events including the radiology posting, the life-

threatening infections and the contaminated irrigation solution.

433.    At no time did the AHC consult an orthopedic surgeon or an infectious disease

expert to determine the circumstances surrounding the life-threatening infections

or the contaminated irrigation solution.

434. Instead, the AHC instructed Lamb to conduct a review of the infections.

435. The AHC also concluded that Dr. Long would no longer be allowed to take the protective measures which had to that point successfully prevented further infected surgeries.

436. By letter dated March 16, 2004 to Defendant Duncan, Defendant Salomone, speaking on behalf of the AHC, wrongfully, maliciously and without basis recommended, *inter alia*, that Dr. Long undergo a psychiatric evaluation citing the protective measures taken by Dr. Long to protect his patients from further infections as "disruptive and problematic" behavior.

437. Aware that no legitimate investigation of the life-threatening infections and the contaminated irrigation solution was being conducted, Dr. Long asked his counsel to report these matters to JCAHO.

438. On or about March 15, 2004, Dr. Long's legal counsel reported the aforesaid conduct by defendants to JCAHO.

439. On or about March 22, 2004, Defendant Hofstetter wrongfully and in violation of the Medical Staff Bylaws suspended Dr. Long's Active Staff Privileges at NMC alleging that Dr. Long was delinquent in completing medical records.

440. Defendant Salomone, in violation of the Medical Staff Bylaws, had not provided the required notification and warning to Dr. Long prior to Defendant Hofstetter's suspension of Dr. Long's privileges.

441. As Defendants Hofstetter and Salomone well knew or reasonably should have known, Dr. Long was not subject to suspension as aforesaid without prior

63

notification by his service chief, Defendant Salomone, that his medical records were incomplete.

442. Defendant Hoftstetter's supension of Dr. Long as aforesaid was in violation of the Medical Staff Bylaws and for purposes of harassment and retaliation as aforesaid.

443. Defendant Hofstetter wrongfully, maliciously and in violation of the Medical Staff Bylaws suspended Dr. Long's privileges in furtherance of the aforesaid conspiracy in restraint of trade and in retaliation for Dr. Long's having demanded release of the aforesaid complication rates, having advised Patient A to bring a medical malpractice action, having reported NMC to the Attorney General's Office and for the purpose of harassing and provoking Dr. Long to manifest intemperate reactions which could then be characterized as "severe behavioral disturbances adversely affecting patient care" to generate after the fact support for Defendant Burfoot's false and malicious defamatory letter.

444. On March 22, 2004, the MEC, chaired by Defendant Duncan and attended by Defendant Salomone, met and accepted the AHC's unfounded and malicious recommendations that, *inter alia*, Dr. Long undergo a psychiatric evaluation, that he be prevented from taking measures to prevent further infections and that Dr. Long's surgical cases - which had been found by the SSSQA to have met the standard of care - be reviewed by outside experts.

445. Dr. Long was unaware the MEC was investigating his conduct.

446. At no time during these proceedings was Dr. Long afforded the opportunity to appear before the MEC to confront or question his accusers or to make an

organized presentation of the facts pertaining to the aforesaid events including, *inter alia,* the radiology posting, the life-threatening infections and the contaminated irrigation solution.

447. At no time did the MEC consult an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution.

448. Instead, the MEC directed Lamb to conduct a review of the infections.

449. Unaware of the aforesaid investigations by the AHC and MEC, but fully aware that no legitimate investigation into the circumstances surrounding the life-threatening infections and contaminated solution had occurred, by letter dated March 29, 2004, Dr. Long's counsel demanded, *inter alia,* that psychiatric experts specializing in corporate psycho-pathology be brought in to study Defendant Hofstetter's retaliatory behavior as part of a root cause analysis of the aforesaid surgical infections and contaminated irrigation fluid.

450. NMC refused to consult the aforesaid expert or conduct any legitimate investigation of the aforesaid events or root cause analysis of the life-threatening infections.

451. On April 1, 2004, Defendant Salomone convened a meeting of the SSSQA.

452. Defendant Hofstetter participated in the meeting of the SSSQA.

453. At that meeting, Sutton and Gregoire falsely and maliciously misrepresented the facts and circumstances surrounding, *inter alia,* the radiology posting and reduction in Dr. Long's privileges as aforesaid.

65

454.    At that meeting, Lamb falsely and maliciously advised the SSSQA that Dr. Long was the single common denominator in the aforesaid infected surgeries.

455.    Despite Defendant Salomone's previous written assurance to Dr. Long that he would be invited to appear before the SSSQA and present the facts concerning the contents of his January 12, 2004 letter to defendant Salomone, at no time was Dr. Long afforded the opportunity to appear.

456.    At no time was Dr. Long afforded the opportunity to appear before the SSSQA to confront or question his accusers or to meet with the SSSQA to present the facts pertaining to the matters set forth in his January 12, 2004 letter including the life-threatening infections.

457.    At no time did the SSSQA consult an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution.

458.    On March 31, 2004, at the same time that they were demanding that Dr. Long undergo a psychiatric evaluation and that his surgical cases - previously found by the SSSQA to have met the standard of care - be referred for an external review, Defendants Hofstetter, Duncan and Salomone approved special privileges pursuant to which Dr. Long would be allowed to perform reverse ball and socket total shoulder replacement surgery at NMC.

459.    The special privileges were effective April 1, 2004.

460.    The reverse ball and socket total shoulder replacement surgery is one of the most technically challenging and difficult operations in all of orthopedics, requiring

special training, certification and skill.

461.    On or about March 26, 2004, Defendant Duncan advised Dr. Long for the first

time that Defendant Hofstetter had recommended a corrective action against Dr.

Long.

462.    Citing strict confidentiality, Defendant Duncan refused to provide Dr. Long with

any further information concerning the corrective action.

463.    On April 5, 2004, Dr. Long and his counsel appeared before the MEC to be

interviewed.

464.    For the first time, Dr. Long was provided with documents pertaining to the

corrective action including, *inter alia*, Defendant Salomone's letter dated March

16, 2004 and Defendant Hofstetter's letter dated March 8, 2004.

465.    This was the first time that Dr. Long became aware of the nature of the corrective

action, certain of the false and malicious misrepresentations of fact by the

defendants and the malicious restrictions and requirements that were to be placed

on his ability to care for his patients and practice at NMC.

466.    This was the first time that Dr. Long became aware that, based on the false and

malicious misrepresentations of fact by defendants, he was to be required to

undergo a psychiatric evaluation.

467.    At the April 5, 2004 meeting, the MEC, under the guidance of Defendants

Duncan, Salomone and Hofstetter, concluded that Dr. Long would not be

permitted to perform surgery unless he underwent a psychiatric evaluation and

that failure to undergo such examination would result in a summary suspension of

67



his privileges.

468.    At that meeting, the MEC, under the guidance of Defendants Duncan, Salomone and Hofstetter, attempted to discredit the findings that the irrigation solution had been contaminated as aforesaid.

469.    At no time was Dr. Long afforded the opportunity to confront or question his accusers.

470.    At no time did the MEC consult an infectious disease expert to determine the circumstances surrounding the life-threatening infections or the contaminated irrigation solution.

471.    Instead, the MEC relied on the false and malicious reports by Lamb and Chagnon that Dr. Long was the single common denominator in the life-threatening infections.

472.    Citing, *inter alia*, the protective measures successfully implemented by Dr. Long to prevent further infections and the malicious misrepresentations of defendants as established fact, the MEC wrongfully and without justification recommended to the Board of Governors that Dr. Long's privileges be suspended pending a psychiatric evaluation of Dr. Long.

473.    On or about April 6, 2004, Defendant Hofstetter wrote to Dr. Long advising, *inter alia*, as follows:

a.    Dr. Long must agree to undergo a psychiatric evaluation within 24 hours or have his hospital privileges suspended;

b.    Dr. Long must agree not to perform surgery pending the psychiatric

68

evaluation or face suspension of his privileges.

474. Attached to the aforesaid letter was a notice of corrective action stating that the measures taken by Dr. Long to prevent further infections were disruptive of NMC's procedures and constituted the basis for the requirement that Dr. Long undergo psychiatric evaluation within 24 hours.

475. In his April 6, 2004 letter, Defendant Hofstetter further advised Dr. Long that he had thirty days to request a fair hearing review of the aforesaid action by NMC's MEC.

476. As with the aforesaid defamatory letters and public posting, the imposition of these unwarranted conditions - including the requirement that Dr. Long no longer take measures to prevent infections - constituted a serious reduction of Dr. Long's Active Staff Privileges.

477. Dr. Long was, therefore, faced with a serious dilemma affecting patient safety and welfare in that, as the possessor of Active Staff Privileges at NMC, he was required to continue performing emergency surgeries when he was on the emergency call schedule.

478. Nevertheless, Dr. Long was now placed in a position where, if he did perform emergency surgeries, he would not be permitted to take the simple but effective steps that he had instituted to prevent further infections.

479. Given these unwarranted conditions, Dr. Long could not in good conscience continue to perform surgeries at NMC. Neither could he refuse to perform surgeries when he was on emergency call since that would also pose an

69

unacceptable risk to patient welfare.

480.   On or about April 7, 2004, faced with the foregoing wrongful, illegal and
malicious actions by defendants, Dr. Long, under duress orchestrated by
defendants as aforesaid and faced by the fact that he could no longer take the
aforesaid protective measures on behalf of his patients, resigned his Active Staff
Privileges.

481.   Dr. Long's Active Staff Privileges were constructively terminated by defendants
whose actions substantially impaired, hampered and made impossible his
continued practice at NMC and pursuit of his practice as an orthopedic surgeon.

482.   By their wrongful, illegal and malicious actions, defendants had, *inter alia*,
maliciously, falsely and publicly smeared and defamed Dr. Long as mentally
unstable, a danger to patients and incapable of safely practicing his profession.

483.   By their wrongful, illegal and malicious actions, defendants had, *inter alia*, made
it impossible for Dr. Long to continue practice at NMC while utilizing the
aforesaid infection control procedures.

484.   It is believed and therefore averred that defendants' wrongful, malicious and
illegal actions were informed by and consistent with standard retaliatory schemes
and destructive practices utilized elsewhere by health care organizations against
physicians which have been widely reported in the news media.

485.   Pursuant to these standard retaliatory schemes and destructive practices as
reported in the news media,  physicians who dare to question or challenge their
hospitals' health care standards are routinely smeared and defamed as, *inter alia*,

70

disruptive, mentally unstable, and unfit to practice their professions.

486.    On or about April 20, 2004, unknown to Dr. Long, NMC wrongfully, illegally and
in violation of the Medical Staff Bylaws and the express terms of Defendant
Hofstetter's letter which had given Dr. Long 30 days to request a fair hearing,
notified the National Practitioner Data Bank that Dr. Long had resigned while
facing a corrective action.

487.    The aforesaid wrongful, illegal and unwarranted notification to the National
Practitioner Data Bank has further damaged Dr. Long by severely impairing his
ability to practice his profession elsewhere.

488.    The aforesaid notification to the National Practitioner Data Bank has now and
forever falsely and maliciously branded Dr. Long as a "problem doctor". As such,
Dr. Long's ability to obtain employment elsewhere in the United States as an
orthopedic surgeon has been virtually eliminated.

489.    On or about May 4, 2004, and numerous times since then, Dr. Long, by counsel,
has timely demanded a fair hearing as provided in the Medical Staff Bylaws and
Defendant Hofstetter's April 6, 2004 letter.

490.    By his demands for a fair hearing, Dr. Long has sought to exercise his due process
contractual rights under the Bylaws to convene a jury of impartial persons drawn
from outside NMC to review the actions of defendants as aforesaid and render a
binding decision for corrective action to redress defendants' wrongful actions and
remove the unwarranted conditions preventing him from taking the simple,
inexpensive but effective steps to prevent further infections in his surgeries.

71

491.  Dr. Long's May 4, 2004 demand for a fair hearing was made within the 30 day notice period provided in Defendant Hofstetter's letter.

492.  As aforesaid, Dr. Long had also made repeated demands for a fair hearing prior to resigning from NMC's staff.

493.  NMC has wrongfully, illegally and in violation of the Medical Staff Bylaws refused Dr. Long's numerous requests for a fair hearing.

494.  Soon after Dr. Long's resignation, NMC, acting at Defendant Hofstetter's direction, referred a substantial number of Dr. Long's surgical cases to the Board of Medical Practice, the medical licensing authority for the State of Vermont.

495.  NMC falsely, maliciously and in bad faith referred the aforesaid cases as proof that Dr. Long had failed to meet the applicable standard of medical care and should lose his medical license.

496.  The referral of Dr. Long's surgical cases to the Board of Medical Practice was unwarranted, malicious, in bad faith and calculated to further harm, harass and threaten Dr. Long, destroy his professional career as an orthopedic surgeon and eliminate him as a competitor to Defendants Archambault and NMC.

497.  After investigation and review, the Board of Medical Practice determined that in every case Dr. Long had met the applicable standard of care.

498.  Starting in the summer of 2004, Defendant Archambault entered into a business relationship with NMC conducting his practice from an office owned and operated by NMC.

499.  NMC provides all radiology services to Defendant Archambault.

72

500.   It is believed and therefore averred that the proceeds of Defendant Archambault's

practice as an orthopedic surgeon inure, in whole or in part, to the benefit of NMC

and, concomitantly, Triad and QHR.

501.   NMC has wrongfully engaged private investigators to investigate Dr. Long.

502.   NMC's use of these private investigators is intended to harass, intimidate and

provoke Dr. Long for the purpose, *inter alia*, of eliciting what later could be

characterized as an emotionally unstable or paranoid reaction by Dr. Long in

support of defendants' illegal and wrongful purposes as aforesaid.

503.   Without justification, NMC maliciously advised the Vermont Board of Medical

Practice that Dr. Long should undergo a psychiatric evaluation.

504.   It is believed and therefore averred that the wrongful and illegal actions as

aforesaid were conducted jointly and in concert by defendants for the illegal

purposes as aforesaid and for the illegal restraint of trade as aforesaid.

505.   The aforesaid actions of all defendants were not taken in furtherance of patient

safety and welfare or legitimate peer review but were illegally, wrongfully,

maliciously and in violation of the Medical Staff Bylaws undertaken in

furtherance of the aforesaid conspiracy in restraint of trade and in retaliation for,

*inter alia*, Dr. Long's having demanded release of the aforesaid complication

rates, having advised Patient A to pursue a medical malpractice action, having

reported NMC to the Attorney General's Office and JCAHO and for the purpose

of intimidation and to harass and provoke Dr. Long to manifest intemperate

reactions which could then be falsely and maliciously characterized as behavioral

disturbances and disruptions of NMC's operations.

## CAUSES OF ACTION

### COUNT I

**Combination and Conspiracy in Violation of the Sherman and Clayton Acts**

**Dr. Long vs. All Defendants**

506.   Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

507.   Beginning in September 2001, the exact date being unknown to Dr. Long, and continuing thereafter up to the present time, Defendants Triad, Quorum, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason, have conspired to inhibit trade and competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in unlawful combination and conspiracy to destroy Dr. Long's career, ability to practice orthopedic surgery and by forcing him to resign from NMC under duress, all as aforesaid.

508.   Defendants' conspiracy has achieved its illegal purpose by driving Dr. Long from practice, putting him out of business, and thereby reducing the provision of orthopedic surgical services in the St. Albans, Vermont market.

509.   Dr. Long has suffered the type of injury that the anti-trust laws are intended to prevent rendering defendants' actions as aforesaid illegal.

510.   The injury suffered by Dr. Long reflects the anti-competitive effect either of the violation or of the anti-competitive acts made possible by the violation.

511.   Dr. Long's injury and damages coincide with the public detriment tending to

result from the violation. The effect of the conspiracy is a diminution in competition in the field of orthopedic surgery at NMC and in the St. Albans, Vermont market.

512. In addition, the actions of defendants as aforesaid, particularly Dr. Long's forced resignation and report thereof to the National Practitioner Data Bank, are black marks on his career that he will always be required to disclose on health care related applications which will inhibit or prevent him from obtaining privileges at other hospitals.

513. Dr. Long continues to be restrained in his ability to make his high quality services readily and fully available to the public, all to the detriment of the public need for such services which cannot be rendered.

514. Defendants have depleted the resources of Dr. Long who, even in those limited instances where he was granted his due process rights under NMC's Medical Staff Bylaws, has been forced to expend substantial financial resources to remain in business or to resist defendants' anti-competitive conspiracy.

515. The effect of defendants' conspiratorial actions as aforesaid has been and continues to be, *inter alia*, to restrain and prevent competition in the field of orthopedic surgical services to the public.

516. As a direct and proximate result of the aforesaid combination and conspiracy, Dr. Long has been compelled to expend considerable sums of money to resist defendants' illegal efforts to deny him the right to practice orthopedic surgery at NMC and in the St. Albans market.

517. As a direct and proximate result of the aforesaid combination and conspiracy, Dr. Long has been caused to suffer and will continue to suffer substantial damages to his reputation, practice and career, all to his detriment.

518. Defendants' concerted efforts to eliminate Dr. Long as a competitor constitutes a group boycott in violation of § 1 of the Sherman Act. By eliminating Dr. Long as a competitor, the boycott successfully reduced competition for the services provided by Defendant Archambault and/or NMC and continues today.

519. Defendants conspired to monopolize or attempt to monopolize the provision of orthopedic surgical services in the St. Albans market in violation of 15 U.S.C. §§ 1 and 2. Defendants have conspired to restrain competition and inhibit trade in violation of 15 U.S.C. §§ 15 and 26.

520. Defendants have knowingly, willingly and maliciously sought to destroy Dr. Long's reputation and surgical practice in order to inhibit or restrain competition from Dr. Long.

521. Dr. Long is unable to state with finality the amount of damages sustained to date by reason of the aforesaid conspiracy. However, he will prove that, but for the illegal acts of defendants as aforesaid, he has suffered damages in excess of $40,000,000.00.

522. Dr. Long is also entitled to three times the damages determined to have been sustained, simple interest on actual damages as allowed by law, punitive damages, costs of suit and attorney's fees, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15 (1988).

523.    Pursuant to 15 U.S.C. § 26, Dr. Long seeks declaratory and injunctive relief as prayed for below.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against Defendants Triad, Quorum, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason jointly and severally as follows:

a.    Compensatory damages in excess of $75,000.00;

b.    Punitive damages in excess of $75,000.00;

c.    Injunctive relief enjoining defendants from any continuation of their unlawful activities;

d.    Costs, attorneys' fees and such other relief as is just and proper.

## COUNT II

### Tortious Interference with Prospective Business Advantage

### Dr. Long vs. All Defendants

524.    Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

525.    As a highly trained, skilled and qualified orthopedic surgeon, Dr. Long had reasonable business expectancies of profitably practicing his profession, future employment, future professional affiliations with hospitals and other health care organizations and providers, rendering future professional services, earning fees for services rendered and otherwise profiting from the practice of medicine.

526.    Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone,

77

Duncan and Mason and each of them had knowledge of Dr. Long's reasonable

expectancies as aforesaid and, with such knowledge, have deliberately,

intentionally, wrongfully and illegally acted singly and in concert to prevent those

expectancies from being realized.

527.   The conduct of Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot,

Salomone, Duncan and Mason and each of them is and was without justification

or privilege and intended to cause Dr. Long substantial harm.

528.   By their acts, defendants have jointly and severally acted maliciously and

intentionally to prevent him from performing orthopedic surgery at NMC and

elsewhere thereby intentionally preventing him from forming relationships with

new patients and with the intended purpose of denying him the opportunity to

perform the professional services for which has been so highly trained.

529.   Defendants' actions have deprived Dr. Long of the vested property right to

perform his professional services at NMC and elsewhere.

530.   As a direct result of defendants' tortious and improper interference with Dr.

Long's reasonable business expectancies, Dr. Long has lost the opportunity to

practice his profession, lost profits now and in the future and sustained other

damages in an amount to be proven at trial.

531.   As a direct result of defendants' interference with Dr. Long's prospective business

advantage, Dr. Long has suffered and will continue to suffer actual damages

including damages for lost profits, loss of past and future earnings and/or earning

capacity in an amount in excess of $40,000,000.00.

532.   Dr. Long has suffered damages for past and future mental anguish and emotional

distress in an amount in excess of $1,000,000.00.

533.   Defendants' conduct was engaged in with malicious, oppressive and fraudulent

intent and designed to wrongfully cause substantial harm to Dr. Long's interests.

534.   As a consequence of defendants' intentional, reckless and wanton acts, Dr. Long

is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against

Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason

jointly and severally as follows:

a.     Compensatory damages in excess of $75,000.00;

b.     Punitive damages in excess of $75,000.00;

c.     Injunctive relief enjoining defendants from any continuation of their unlawful

activities;

d.     Costs of this action and such other relief as is just and proper.

## COUNT III

### Tortious Interference with Contract

### Dr. Long vs. Defendants Archambault, Burfoot, Duncan, Mason, Salomone

535.   Dr. Long repeats and re-alleges each and every allegation contained in the

preceding paragraphs with the same force and effect as if set forth herein.

536.   As the holder of full, unrestricted Active Staff Privileges at NMC, Dr. Long was

entitled to certain contractual rights under the Medical Staff Bylaws and

otherwise.

537.    Dr. Long's contractual rights included, *inter alia*, the right to practice his profession free from defendants' unwarranted and unjustified interference and the right to a fair hearing to review and correct infractions of and interference with the exercise of his rights.

538.    Defendants Archambault, Burfoot, Duncan, Salomone, and Mason each had knowledge of Dr. Long's contractual relationship with NMC as aforesaid and, with such knowledge, have jointly, severally, deliberately and intentionally interfered with and induced NMC to abrogate its contract with Dr. Long.

539.    The conduct of defendants Archambault, Burfoot, Duncan, Salomone, and Mason and each of them is and was without justification or privilege and intended to cause Dr. Long substantial harm.

540.    As a direct result of defendants' tortious and improper interference with Dr. Long's contract with NMC, Dr. Long has lost the opportunity to practice his profession, lost profits now and in the future and sustained other damages in an amount to be proven at trial.

541.    Defendants' conduct was engaged in with malicious, oppressive and fraudulent intent and designed to cause substantial harm to Dr. Long's interests.

542.    As a direct result of defendants' interference with Dr. Long's contract with NMC, Dr. Long has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $40,000,000.00.

543.    Dr. Long has suffered damages for past and future mental anguish and emotional



distress in an amount in excess of $1,000,000.00.

544.    As a consequence of defendants' intentional, reckless and wanton acts, Dr. Long
is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against
Defendants Archambault, Burfoot, Duncan, Salomone, and Mason jointly and severally as
follows:

a.    Compensatory damages in excess of $75,000.00;

b.    Punitive damages in excess of $75,000.00;

c.    Injunctive relief enjoining defendants from any continuation of their unlawful
activities;

d.    Costs of this action and such other relief as is just and proper.

## COUNT IV

### Tortious Interference with Business

### Dr. Long vs. All Defendants

545.    Dr. Long repeats and re-alleges each and every allegation contained in the
preceding paragraphs with the same force and effect as if set forth herein.

546.    The forced resignation of Dr. Long from NMC through the actions of defendants
as well as the public branding of Dr. Long as having resigned and being unfit to
practice his profession and as emotionally disturbed as aforesaid constitutes
tortious interference with Dr. Long's business, particularly his relationship with
his patients.

547.    Defendants jointly and severally forced Dr. Long's resignation and published their

81

defamations without justification or privilege.

548. Defendants' actions as aforesaid have made it impossible for Dr. Long to seek employment elsewhere and have effectively terminated his career in medicine.

549. Defendants' actions as aforesaid were undertaken with malice and with the intention of preventing contractual relationships between Dr. Long and his patients as well as the contractual relationships with his referral sources and Foerster, his employer.

550. Defendants did and do not possess a privilege, legal justification or excuse which would have condoned such actions.

551. Dr. Long's surgical practice and business would not have been lost, and he would have obtained substantially greater business in the absence of defendants' wrongful interference.

552. As a direct result of defendants' interference with Dr. Long's business, Dr. Long has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $40,000,000.00.

553. Dr. Long has suffered damages for past and future mental anguish and emotional distress in an amount in excess of $1,000,000.00.

554. As a consequence of defendants' joint, several, intentional, reckless and wanton acts, Dr. Long is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against Defendants Triad, QHR, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason

82

jointly and severally as follows:

    a.    Compensatory damages in excess of $75,000.00;

    b.    Punitive damages in excess of $75,000.00;

    c.    Injunctive relief enjoining defendants from any continuation of their unlawful activities;

    d.    Costs of this action and such other relief as is just and proper.

### COUNT V

### Breach of Contract

### Dr. Long vs. NMC

555.    Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

556.    Pursuant to the Medical Staff Bylaws, Dr. Long is entitled to certain contractual rights, due process rights and privileges including, but not limited to, the exercise of his Active Staff Privileges at NMC without unwarranted reduction and the right to a fair hearing to review and redress by way of a corrective action any such reduction of his privileges.

557.    As aforesaid, Dr. Long suffered repeated unwarranted reductions in his supposedly full, unrestricted Active Staff Privileges at NMC including but not limited to the following:

    a.    Being required to re-apply for Active Staff Privileges at NMC within 6 months of having been granted them even though they had been granted for a period of two years;

b.    The publication of the aforesaid defamatory letters and public posting

which reduced his privileges by adversely affecting his referral base,

surgical practice and ability to interact appropriately and professionally

with patients and NMC staff;

c.    The imposition of the unwarranted restrictions on the simple, inexpensive

but effective measures that he had been taking to prevent further surgical

infections.

558.    As to these and other reductions in privileges as aforesaid, Dr. Long was entitled

to and did demand a fair hearing.

559.    Also pursuant to the Medical Staff Bylaws, Dr. Long was legally entitled to be

free from invidious discrimination for any reason.

560.    Dr. Long made demand for a fair hearing to correct the abusive and invidious

discrimination against him by defendants as aforesaid.

561.    In each and every instance, Dr. Long's demands for a fair hearing were

wrongfully, illegally and in violation of the Medical Staff Bylaws denied by

Defendant Hofstetter in his capacity as CEO of NMC and/or others acting on

behalf of NMC.

562.    The denial of Dr. Long's rights under the Medical Staff Bylaws has caused him

substantial and permanent damage.

563.    By denying Dr. Long his due process and substantive rights under the Medical

Staff Bylaws, NMC has denied him the opportunity to expose, correct and end

defendants' malicious course of conduct as aforesaid.

84

564.    Because Dr. Long was wrongfully denied his due process and substantive rights under the Medical Staff Bylaws, his privileges have been wrongfully reduced and his professional reputation and career as an orthopedic surgeon have been damaged as aforesaid, all to his detriment.

565.    Moreover, in breach of the Medical Staff Bylaws, NMC wrongfully notified the National Practitioner Data Bank that Dr. Long had resigned in the face of a corrective action prior to the expiration of the time available to him under the Bylaws and Defendant Hofstetter's letter of April 6, 2004 to elect a fair hearing.

566.    As aforesaid, Dr. Long demanded a fair hearing prior to the deadline for doing so.

567.    Nevertheless, in violation of the Medical Staff Bylaws, NMC wrongfully notified the National Practitioner Data Bank as aforesaid damaging Dr. Long irreparably by branding him for all time as a "problem doctor" and making it virtually impossible for him to obtain employment elsewhere in the United States as an orthopedic surgeon.

568.    NMC further breached the Medical Staff Bylaws by conducting a malicious peer review of Dr. Long as aforesaid, not for the proper purpose of promoting quality healthcare, but for the wrongful and illegal purpose of retaliating against Dr. Long, restraining trade and destroying his business and career as an orthopedic surgeon as aforesaid.

569.    As a direct result of NMC's breaches, Dr. Long has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $40,000,000.00.

570.   Dr. Long has suffered damages for past and future mental anguish and emotional distress in an amount in excess of $1,000,000.00.

571.   Dr. Long is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against Defendant NMC as follows:

a.   Compensatory damages in excess of $75,000.00;

b.   Punitive damages in excess of $75,000.00;

c.   Injunctive relief enjoining defendants from any continuation of their unlawful activities;

d.   Costs of this action and such other relief as is just and proper.

**COUNT VI**

**Defamation/Libel Per Se/Slander Per Se**

**Dr. Long vs. Archambault, Burfoot,**

**Hofstetter, Triad, QHR, and NMC**

572.   Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

573.   As set forth above, on or about December 2, 2002, Defendant Burfoot, acting in the scope of his agency and employment by NMC, wrote to Dr. Edward Haak, Chairman of NMC's Credentials Committee, ("Haak") falsely asserting that Dr. Long lacked technical competence as a surgeon.

574.   Defendant Burfoot's letter to Haak was false, malicious, defamatory, in bad faith and calculated to wrongfully harm Dr. Long economically, professionally and in

86

his reputation.

575.    As set forth above, on or about December 20, 2002, Defendants Burfoot and
Hofstetter, acting within the scope of their agencies and employments by NMC,
Triad and/or QHR, intentionally, wrongfully, maliciously and in bad faith
published a false and defamatory letter to, among others, NMC's Credentials
Committee and NMC's MEC recommending that Dr. Long not be granted Active
Staff Privileges since Dr. Long had exhibited "severe behavioral disturbances that
have adversely affected patient care."

576.    Defendants Burfoot and Hofstetter, acting within the scope of their agencies and
employments by NMC , Triad and/or QHR, intentionally, wrongfully, maliciously
and in bad faith published the aforesaid false and defamatory letter to members of
the Credentials and MECs and other persons not belonging to those committees.

577.    Defendants Burfoot and Hofstetter published the aforesaid false and defamatory
letter by sending copies to the aforesaid committee members without any advisory
on the copies or envelopes that the letter was to be treated as confidential.

578.    Despite repeated demands for copies of the aforesaid letters, Dr. Long has been
unable to obtain them and, therefore, describes these defamatory publications
solely from memory.

579.    As set forth above, on or about November 22, 2003, Defendant Hofstetter, Sutton
and Gregoire and each of them wrongfully caused a large printed defamatory
notice to be publicly posted in NMC's Diagnostic Imaging Library stating the
following:

87

EFFECTIVE IMMEDIATELY

DR. LONG MAY NOT SIGN OUT ANY JACKETS FROM

THE FILM LIBRARY. IF YOU HAVE ANY PROBLEMS

WITH HIM ON THIS MATTER PLEASE REFER IT TO

MARK AND IF HE IS NOT AVAILABLE REFER IT TO

PETER HOFSETTER (sic).

580.   In addition to the aforesaid letters and public posting, Defendant Archambault

made many public statements as aforesaid to patients, hospital staff, professional

colleagues, potential patients and others falsely and maliciously disparaging Dr.

Long's professional competence and skills.

581.   The false, defamatory letters, public posting and statements by Defendant

Archambault as aforesaid exposed Dr. Long to public shame, hatred, contempt,

ridicule, ostracism, degradation and disgrace, induced a false opinion of Dr. Long

as mentally unstable, emotionally disturbed and unfit to practice his profession,

deprived Dr. Long of the confidence and friendly intercourse with professional

colleagues, hospital staff, patients, potential patients and the St. Albans, Vermont

market.

582.   The aforesaid wanton, reckless and/or intentional acts of defamation perpetrated

by defendants wrongfully disparaged Dr. Long in his profession by directly

attacking his competence, ability, mental health, emotional stability, credibility,

fitness to practice medicine, and reputation as a medical professional.

583.   The aforesaid publications by defendants as well as the forced resignation of Dr.

88

Long from NMC and related matters have been communicated by defendants to other physicians, hospitals, patients, organizations and individuals.

584. Despite the intent of the HCQ Act and Medical Staff Bylaws that peer review proceedings be held in a confidential manner, defendants allowed the information regarding Dr. Long's peer review to be published to various persons not participating in the peer review such that Dr. Long has been labeled as emotionally disturbed and unfit to practice his profession.

585. Defendants' publications were slanderous per se and libelous per se because they had a tendency to injure Dr. Long in his profession.

586. As a consequence of the aforesaid intentional, wanton and/or reckless defamations perpetrated by Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, and each of them, Dr. Long sustained conscious pain and suffering, physical injury, great mental distress, shock, humiliation and economic loss.

587. As a consequence of the aforesaid intentional, wanton and/or reckless defamations perpetrated by Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, and each of them, Dr. Long is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against Defendants Triad, QHR, NMC, Archambault, Burfoot and Hofstetter jointly and severally as follows:

a.    Compensatory damages in excess of $75,000.00;

b.    Punitive damages in excess of $75,000.00;

c.    Injunctive relief enjoining defendants from any continuation of their unlawful

89

activities;

d.      Costs of this action and such other relief as is just and proper.

## COUNT VII

### False Light

### Dr. Long vs. All Defendants

588.    Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

589.    The defamatory letters, public posting and statements as aforesaid were substantially false.

590.    By their defamatory letters, public posting and statements as aforesaid, defendants portrayed Dr. Long to his professional colleagues, hospital staff, patients and the community at large in a false manner.

591.    The aforesaid defamatory letters, public posting and statements as aforesaid cast Dr. Long in a false light that would be considered highly offensive to any reasonable person and/or by any objective standard.

592.    At the times they published the defamatory letters, public postings and statements, defendants did so knowing that they were false and/or acted in reckless disregard as to the falsity of their publications and the false light in which Dr. Long was thereupon placed.

593.    As a consequence of being placed in a false light by Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan, Mason and each of them, Dr. Long sustained conscious pain and suffering, physical injury, great

90



mental distress, shock, humiliation and economic loss.

594.    As a consequence of being placed in a false light by Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason and each of them, Dr. Long is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason jointly and severally as follows:

a.    Compensatory damages in excess of $75,000.00;

b.    Punitive damages in excess of $75,000.00;

c.    Injunctive relief enjoining defendants from any continuation of their unlawful activities;

d.    Costs of this action and such other relief as is just and proper.

## COUNT VIII

### Outrage

### Dr. Long vs. All Defendants

595.    Dr. Long repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if set forth herein.

596.    As a consequence of their aforesaid wrongful actions, including but not limited to the destruction of Dr. Long's professional career and reputation and forcing him to surrender his Active Staff Privileges, Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason and each of them intentionally inflicted emotional distress upon Dr. Long.

91

597.   Through the aforesaid pattern of extreme and outrageous conduct, which was
       beyond all possible bounds of decency, and which may be regarded as atrocious .
       and utterly intolerable in a civilized society, Defendants Triad, QHR, NMC,
       Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason and each of
       them discredited, harassed, humiliated and retaliated against Dr. Long.

598.   As a consequence of defendants' intentional infliction of emotional distress upon
       Dr. Long, he sustained conscious pain and suffering, impaired health, great mental
       distress and humiliation.

599.   As a consequence of defendants' intentional infliction of emotional distress upon
       Dr. Long, he is entitled to compensatory and punitive damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against
Defendants Triad, QHR, NMC, Hofstetter, Archambault, Burfoot, Salomone, Duncan and Mason
jointly and severally as follows:

a.     Compensatory damages in excess of $75,000.00;

b.     Punitive damages in excess of $75,000.00;

c.     Injunctive relief enjoining defendants from any continuation of their unlawful
       activities;

d.     Costs of this action and such other relief as is just and proper.

## COUNT IX

### Negligent Hiring/Supervision

### Dr. Long vs. Triad, QHR and NMC

600.   Dr. Long repeats and re-alleges each and every allegation contained in the

preceding paragraphs with the same force and effect as if set forth herein.

601.  The actions of Defendant Hofstetter as aforesaid were taken maliciously with intent to harm Dr. Long as aforesaid.

602.  Defendants Triad, QHR and NMC are answerable in damages to Dr. Long for the negligent hiring and supervision of Defendant Hofstetter.

603.  The wrongful, illegal and malicious actions of Defendant Hofstetter against Dr. Long as aforesaid were reasonably foreseeable by Defendants Triad, QHR and NMC.

604.  Defendants Triad, QHR and NMC negligently failed to ascertain the propensities of Defendant Hofstetter for wrongful, illegal, destructive, vengeful and malicious action before placing him as the Chief Executive Officer of NMC in which position he was able to orchestrate and perpetrate the aforesaid malicious acts against Dr. Long.

605.  Thereafter, Defendants Triad, QHR and NMC negligently failed to supervise Defendant Hofstetter to prevent him from maliciously retaliating and acting illegally in the manner aforesaid against Dr. Long.

606.  As a direct and proximate result of Defendants Triad, QHR and NMC's negligence, Dr. Long has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity in an amount in excess of $40,000,000.00.

607.  Dr. Long has suffered damages for past and future mental anguish and emotional distress in an amount in excess of $1,000,000.00.

93

608.   As a consequence of defendants' negligence, Dr. Long is entitled to compensatory

damages.

WHEREFORE, Dr. Long prays that judgment be entered in his favor and against

Defendants Triad, QHR and NMC jointly and severally as follows:

a.   Compensatory damages in excess of $75,000.00;

b.   Injunctive relief enjoining defendants from any continuation of their unlawful

activities;

c.   Costs of this action and such other relief as is just and proper.

### COUNT X

**Violation of Federal Health Care Quality Improvement Act**

**Dr. Long vs. All Defendants**

609.   Dr. Long repeats and re-alleges each and every allegation contained in the

preceding paragraphs with the same force and effect as if set forth herein.

610.   The Health Care Quality Improvement Act ("HCQ Act"), which was designed to

encourage physicians to engage in reviews of their peers, permits immunity to

attach to such review activities provided the reviews meet certain procedural

requirements, i.e., that the review is taken (a) in the reasonable belief that the

action was in furtherance of quality health care, (b) after reasonable investigation

of the facts, (c) after adequate notice and hearing procedures are afforded to the

physician or after such other procedures as were fair to the physician under the

circumstances, and (d) in the reasonable belief that the corrective action is

warranted by facts known. See 42 U.S.C. §§ 11111(a)1, 11112(a).

94

611.  By their actions as aforesaid, defendants have forfeited their immunity under the

HCQ Act as well as the corresponding laws of Vermont because their actions

were malicious, in bad faith and not taken in the reasonable belief that they were

acting in furtherance of quality health care.

612.  Instead of acting to promote quality health care, defendants acted maliciously and

in bad faith for the purposes of inhibiting trade, restraining commerce and

retaliating against Dr. Long, all as aforesaid.

613.  Defendants have further forfeited their right to immunity since Dr. Long's

repeated demands for a fair hearing were never granted.

WHEREFORE, Dr. Long seeks a declaration that defendants are not entitled to immunity

under federal or state law.

DAVIS, PARRY & TYLER, P.C.

Lloyd George Parry, Esquire
Attorney for Raymond A. Long, M.D.
1525 Locust Street, 14th Floor
Philadelphia, PA 19102
215-732-3755

G:\Share\LGP\Long, Ray P-343.1\legal\complaints\revised amended complaint.wpd

95